[S. F. No. 13603. In Bank.—January 18, 1930.]

PIONEER EXPRESS COMPANY (a Corporation), Petitioner, v. RAY L. RILEY, as Controller, etc., Respondent.

Thelen & Marrin for Petitioner.

U. S. Webb, Attorney-General, R. L. Chamberlain and Leon French, Deputies Attorney-General, and Dixwell L. Pierce for Respondent.

RICHARDS, J.—The petitioner applies to this court for a writ of mandate to be' directed against Ray L. Riley, as Controller of the state of California, and having for its purpose that of compelling him to issue to the petitioner his official receipt showing that the petitioner has paid in full all taxes which are due and payable to the state of California or that may be legally assessed against the petitioner, its franchises or property for the fiscal year 1929–1930, under and by virtue of the provisions of section 15, article XIII of the Constitution and section 3664aa of the Political

Code of the state of California. By the aforesaid provisions of the Constitution and Political Code the state board of equalization is organized and empowered to act in the matter of the levy and collection of state taxes upon such transportation companies as are common carriers and are engaged in doing business as such upon the public highways between fixed termini within said state. The amount of the tax thus to be imposed and collected is five per cent of the gross receipts of such transportation carrier, whether an individual, a partnership or a corporation, and such tax is assessed and required to be paid to the state Controller upon and after a report by such carrier to the equalization board, and upon an audit, if necessary, of the books and accounts of such carrier, in order to verify or qualify such report. The petitioner is and for several years has been a corporation duly organized as a highway transportation company, doing business along the public highways of this state between San Francisco and San Jose, with fixed terminals in each of said cities and in the intermediate towns and cities. Prior to March 24, 1929, the petitioner, as such transportation company, and in compliance with the foregoing provisions of the Constitution and Political Code, filed with the state board of equalization its report, in conformity with the requirements of law and the regulations of said board, wherein the total gross receipts of said transportation company from the carrying of freight along said route for the year ending December 31, 1928, amounted to $45,926.85. Thereafter the board of equalization caused an audit to be made of the books and records of the petitioner and also of the books and records of another corporation known as Gibson's Express Incorporated, and from which latter audit it appeared that the gross receipts of Gibson's Express Incorporated from the operation of its business, which is hereinafter more particularly described, for the year ending December 31, 1928, was $58,557.31. Upon receiving said audit the board of equalization proceeded to add the gross receipts of Gibson's Express Incorporated, which had theretofore made to it no report, to the gross receipts of the petitioner herein, which had not included or mentioned the gross receipts of Gibson's Express Incorporated in its aforesaid report, and thereupon notified petitioner that its assessment as a highway transportation company would be based upon the added

gross receipts of both corporations, amounting to $104,484.16, and that the amount of the state tax to be levied and collected thereon was to be five per cent thereof. The petitioner protested before said board against its increase in taxes. The board, after a hearing upon the protest, refused to modify its tax levy and accordingly made and entered an order fixing the petitioner's tax for the fiscal year 1929-1930 at the sum of $5,224.20, and having done so reported its assessment to the state Controller as provided by law, and the state Controller thereafter proceeded with the collection of the same in the manner provided by law. Thereupon the petitioner made payment to the Controller of the amount of its tax which would have been leviable and collectible upon its reported and audited amount of its gross receipts of the aforesaid fiscal year, exclusive of the amount of tax sought to be imposed upon it based upon the gross receipts of Gibson's Express Incorporated, for which latter sum it claimed it was not liable. It is conceded that if this claim of the petitioner is well founded, it became by its aforesaid payment entitled to receive from the state Controller the receipt which has been sought through the issuance of this writ. The foregoing facts, together with certain other averments relating to the organization, stock ownership and method of business of these two corporations, have been fully set forth in the petition filed herein, and the order to show cause having been issued thereon, the respondent appeared and answered the petition and in so doing made such admissions and denials as seemed to this court to require a reference for the purpose of ascertaining the truth of the disputed issues of fact. Such reference was made, B. Grant Taylor being appointed as referee to take such testimony, and said referee, after such hearings as were required, has made and filed his report herein. This matter coming on for hearing after the making and filing of said report, counsel for the respective parties have presented their oral argument and extended briefs in support and in opposition to the demand of the petitioner for the issuance of said writ, and the matter having been submitted to this court for decision, it has thus become necessary to find the facts as developed by the report of the referee and by the admissions of the respective parties to this proceeding. The facts thus to be ascertained are in the main based upon either the un-

disputed evidence before the referee, or the admissions of the parties hereto in their arguments and briefs, and which facts may be summarized and stated in their chronological sequence as follows:

The petitioner is and ever since 1924 has been a corporation duly organized under the laws of the state of California for the purpose of conducting the business of a public transportation company upon the public highways between San Francisco and San Jose and intermediate points. Prior to its corporate organization and since about 1917 it had existed in the form of a copartnership, comprised of S. B. McLenegan, now deceased, and his son C. S. McLenegan, and which copartnership during the period of its existence conducted said business as such. During those years it had a rival in business known as Gibson's Express Incorporated, and which conducted up to 1919 a competing business with said partnership between said points, operating from separate termini. In 1919 these competing companies entered into an agreement to co-operate and to do a combined business from the same termini, and they accordingly in that year applied for and received permission so to do from the state Railroad Commission. The two companies were not, however, merged thereby, but they continued to operate as separate institutions, maintaining their separate identities and equipment, as well as their separate partnership interests, stock ownership and control. In 1924, as we have seen, said partnership became a corporation and its stock ownership therein was divided as to practically the whole thereof between the two members of the said former copartnership. After such organization the two corporations continued as before to co-operate in business but to maintain otherwise their separate entities. The business which both of these institutions were then conducting and thereafter continued to conduct co-operatively until January 1, 1927, was one which included not only the transporting of freight of various kinds along the public highways between said fixed termini, but also what is known as a "pick-up and delivery service," which consisted in the collection of articles in the cities and towns within which they had their combined termini and the delivery thereof to such termini, whereupon such freight was transported to its several destinations, and, reaching there, was conveyed from such termini to the local address of the

consignee. On or about January 1, 1927, however, Gibson's Express Incorporated concluded to discontinue its inter-city service as a transportation company and confine its operations to a local drayage business in the larger cities. At or about the same date the petitioner concluded to discontinue its pick-up and delivery service in such cities and confine its activities solely to that of a common carrier, conducting a transportation business between its designated termini. It accordingly, on or about May 21, 1928, filed an application with the Railroad Commission for permission to eliminate from its former transportation service the pick-up and delivery feature thereof and to discontinue such service within the corporate limits of San Francisco, Burlingame, San Mateo, Redwood City, Palo Alto and San Jose, and to thereafter confine its operation and tariff schedule to its transportation business between its fixed termini in said cities. The Railroad Commission, after a hearing thereon granted said application and permitted the petitioner to file with said commission a tariff schedule from which all provisions and charges relating to a pick-up and delivery service in said cities were eliminated, and the tariff schedules of the petitioner were confined to its aforesaid transportation service between said termini. At or about the same time Gibson's Express Incorporated, having abandoned its transportation service formerly maintained between said termini in said cities, applied to the Railroad Commission for permission to formally abandon such service and all rights, privileges or franchises theretofore possessed and operated under prior orders of the commission and to confine its operations strictly to a pick-up and delivery service, or, in other words, a draying business in said cities. The Railroad Commission also granted this application, and on or about October 31, 1928, made and entered its order canceling all of the existing tariffs of Gibson's Express Incorporated, with the result that said corporation has not since said date had any tariff on file with said commission, nor have its operations in its said draying business been subject to the jurisdiction of said commission. The foregoing conditions and limitations of the respective business conducted by each of said corporations as thus established under the respective orders of the Railroad Commission still continue to exist, and neither of said corporations since the making and entry of

such orders has undertaken to conduct any business other than that to which its respective operation was thus confined. Upon the organization of Pioneer Express Company as a corporation the stock of said corporation then issued and ever since outstanding amounted to 2,500 shares of common stock, the whole of which, with the exception of a share or two, was divided between S. B. McLenegan and his son C. S. McLenegan, the members of the preceding copartnership. The duly elected officers of said corporation were: President S. B. McLenegan, during his lifetime, vice-president C. S. McLenegan, secretary E. M. Hays, a daughter of S. B. McLenegan. The board of directors thereof were the aforesaid persons and Walter Robinson, the attorney for the corporation. Just prior to the death of S. B. McLenegan in 1927, his son C. S. McLenegan acquired by gift from his father practically all of the stock of Pioneer Express Company, and has since been the owner thereof. The incorporators of Gibson's Express Incorporated were originally J. R. Gibson, Bertha Ross and H. F. William Brockman, who were the owners of practically all of its issued stock, and so continued to be down to the early part of 1928, when one of its incorporators having died, the remaining two concluded to go out of business, and as a result thereof the entire stock of said corporation was offered for sale, and about one-half thereof was purchased by Carrie C. McLenegan, the wife of S. B. McLenegan, with funds belonging to her as her separate property. Not having sufficient money on hand from that source to purchase all of the stock of the aforesaid incorporators of Gibson's Express Incorporated, her husband, S. B. McLenegan, purchased the balance thereof for the purpose of holding the same until Carrie C. McLenegan might be in funds to take over the same, which she did shortly thereafter, repaying her husband the purchase price thereof out of her separate property, and she has ever since said time been the owner of practically all of the corporate stock of Gibson's Express Incorporated as her sole and separate estate, and has been since her purchase of the stock the president of the corporation. Upon the acquisition of the entire stock ownership of Gibson's Express Incorporated by his mother, C. S. McLenegan, who had already by the death of his father become the owner of the larger portion of the corporate stock of Pioneer Express

Company, became manager of both corporations and managed and operated the same and the business thereof from the same office, but keeping the books and accounts of each of said corporations entirely separate from the other, and distributing the net earnings and dividends of each periodically to those persons who appear upon such books to be the owners respectively of the corporate stock thereof. It would be natural under such circumstances that a large part of the pick-up and delivery business, consisting of the bringing of packages of freight to the office and terminal of the Pioneer Express Company in any of said cities for the purpose of its transportation by the latter to its office and terminal in the city to which such freight had been consigned, would be done through the medium of Gibson's Express Incorporated. The charges, however, for such pick-up and delivery service were kept separate on the books of said corporation, and on the other hand the cost and charges for the transportation of said freight to the terminal in each of said cities to which said freight was destined to go were in every instance separately kept upon the books of Pioneer Express Company. The evidence taken herein discloses that Gibson's Express Incorporated did a considerable amount of drayage in each of said cities wherein it had headquarters independently of its pick-up and delivery service with relation to packages destined to its respective termini by the Pioneer Express Company, and that in so far as said separate drayage business was being conducted the Pioneer Express Company had no interest or concern therein and was entitled to receive and did receive no part of the profit derived therefrom by Gibson's Express Incorporated. Under the combined management of these corporations by C. S. McLenegan after the death of his father the clerical work of the combined officers of both was, in the main, performed in such offices by the employees of Gibson's Express Incorporated, which paid the salaries of these employees for such service, making no charge therefor against the other corporation. C. S. McLenegan, however, the manager of both corporations, was paid a fixed and separate salary for his service as such to each, and as to all the other employees of each of said corporations they were paid in each and every instance by the corporation to which their services as the employees thereof were rendered, and, as we have seen, the net earnings of

each corporation were strictly and separately kept upon the books thereof and were periodically distributed to the stockholders of each of said corporations according to their respective stock ownership therein as shown upon the books of each. The evidence taken before the referee further shows that about the time when these two entities ceased their rivalry a third corporation, known as Peninsula Terminal Company, was organized, for the purpose of owning and maintaining terminal offices in each of the said cities, together with automotive equipment in the way of trucks and cars for the use of each of the aforesaid corporations in and about the cities where such terminals were maintained. The stock of this latter corporation was divided between the other two corporations and is now held separately by each. As to the automotive equipment owned by the Peninsula Terminal Company, it rents the motor vehicles constituting such equipment to each of said corporations according to the daily needs thereof, being paid by each a fixed rental for such use, and distributing the net earnings of the latter corporation periodically among the stockholders thereof.

The foregoing facts with reference to the development, stock ownership and operations of these three corporations have been established by practically undisputed evidence, and in fact are in the main admitted by the showing made and the briefs submitted by the counsel for the respondent. It is, for example, admitted ''that Pioneer Express Company and Gibson's Express Incorporated have each its own set of stockholders and officers and maintain a separate corporate existence.'' It is contended, however, by the respondent that there is such an interlocking of control and ownership in the McLenegan family as binds these corporations together in an inseparable whole. It is nowhere, however, shown, and it is not contended by the respondent that in the creation and maintenance of each of these corporations there was any fraudulent purpose or intent on the part of the members of the McLenegan family, and at the last analysis the respondent concedes ''that it is the nature of the business conducted that determines its tax classification and not its ownership.''

The aforesaid concessions made on behalf of the respondent would seem to reduce the problems before us for determination in this proceeding to two in number, the first of

which is whether the nature and conduct of the two lines of business, as conducted by the three foregoing corporate entities, are in their nature and essence inseparable. The answer to this problem seems to us to be found in the history and development of freight transportation between different and distant termini. It is a matter of common knowledge that prior to the recent development of transportation along the public highways of this and other states by means of motor vehicles, such transportation was, in the main, conducted by the railroads, and that during such period, and even up to the present time, the business of pick-up and delivery of freightage was one which was carried on by trucking companies or individuals and was entirely separate and severable from the main business of the railroads, which was that of transporting such freightage as was brought by such individuals or trucking companies to its established depots to the point of destination thereof which was at an established depot of the carrier, and that the matter of bringing such freightage to the carrier's depot at the one end, or of delivering the same freightage from the carrier's depot at the other end to the consignee thereof at his home or place of business, was a matter with which the railroad carrier had no concern. There is nothing in the recent development of highway transportation by means of motor-trucks or vehicles which would render the collection and carriage and delivery of freightage any more inseparable than it was formerly or than it is now when the consignor seeks to choose a railroad for the carrier of his wares. It may be an inducement to a consignor to have his goods picked up at his doorstep, but it is not an inseparable condition that this should be done by a single transportation company, nor is it an inseparable condition that a consignee must have his delivery made at his doorstep by a single concern, and we are of the opinion as a matter of common observation that there are still many consignors who make use of the almost numberless expressmen to convey their goods to the fixed terminal of the transportation company, and many consignees who so receive delivery of such goods at the other fixed terminal of the transporter thereof. ■

We conclude, therefore, that the business of a public transportation company in conveying freightage from one of its fixed terminal stations to another is not, in the nature of

things, inseparable from the pick-up and delivery business which has to do with the collection of freightage at its terminal depots at the one end and the distribution thereof at the other end of the fixed termini which it is bound to establish and maintain in conformity with law.

The second problem is as to whether a group of persons, whether belonging to one family or not, who may choose to form themselves into one or more corporate entities for the convenient conduct of such business as they may see fit to undertake may not in good faith and without fraudulent design adopt and maintain such separate corporate entities for the purpose of conducting several lines of business which, while in some degree connected, are not in the nature of things inseparable. We are satisfied, without going into further detail, that common knowledge and observation would serve to supply an answer to this problem which would also be adverse to the contention which the respondent makes in opposition to the issuance of this writ. The authorities which have been cited on both sides of this controversy are of little aid or value in the determination of the two foregoing problems. But we think it may be stated as a reasonable conclusion of this whole matter that any citizen or group of citizens seeking to engage in any single line or in several allied lines of business endeavor by which property is accumulated and profits derived may adopt whatever lawful means may exist for the lessening of the burden of taxes, which in one form or other may be laid upon such properties or profits. In every case involving "the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." (*Gould* v. *Gould*, 245 U. S. 151 [62 L. Ed. 211, 38 Sup. Ct. Rep. 53]; *Estate of Potter*, 188 Cal. 55, 64 [204 Pac. 826].) We are of the opinion that the foregoing principle should be given full application to the powers and duties of the state board of equalization and of the state controller with regard to such situations as are presented by the practically uncontradicted evidence and the admissions of the parties in the instant case, in the absence of any show-

ing of a want of good faith or of any fraudulent intent on the part of the McLenegan family to accomplish an evasion of tax burdens which the state under the foregoing provisions of the Constitution and statutes may lawfully impose. It would not seem just or reasonable to permit such officials to go behind the corporate entities which may be engaged in conducting certain severable lines of business in an endeavor to show that the capital stock of such corporate entities is owned or controlled by a few or many persons, whether such persons may happen to be allied in family or in social or in business relationships while engaged in doing that which, in the absence of such alliances, they have a lawful right to do.

Let the writ issue as prayed for.

Shenk, J., Waste, C. J., Curtis, J., Preston, J., Langdon, J., and Seawell, J., concurred.