[*Civ. No.* 5498. Third Appellate District.—December 11, 1935.]

B. F. BOESSOW, Appellant, v. CHARLES G. JOHNSON, Treasurer, etc., Respondent.

Inman & West for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

PLUMMER, J.—By this action the plaintiff sought to recover from the defendant, as Treasurer of the State of California, three separate sums of money alleged to have been paid under protest as a transportation license tax claimed by the defendant, as Treasurer of the State of California, to be due the state under and in accordance with the provisions of chapter 339, Statutes of California, 1933, page 928. The defendant had judgment, and from this judgment the plaintiff appeals.

The record shows that for at least two years prior to the enactment of the Transportation License Tax Act just referred to, approved May 15, 1933, the plaintiff, as an independent contractor, had been collecting milk for the Sego Milk Products Company (hereinafter called "Milk Company"), operating a fleet of trucks bought by the plaintiff from the Milk Company. Prior to the year 1931, the plaintiff had been operating the same fleet of trucks as an employee of the Milk Company. About the beginning of 1931, the plaintiff entered into a contract, by the terms of which he purchased from the Milk Company the fleet of trucks theretofore owned and operated by the Milk Company. Beginning with the year 1931 the plaintiff thereafter continued to operate the fleet of trucks as an independent contractor, under an agreement with the Milk Company, receiving as compensation therefor 12½ cents per hundred weight. The duties of the plaintiff, as independent contractor, were to go around through the farming country from which the Milk Company derived its milk products, collect the milk, and deliver the same to the Milk Company at its place of business in the town of Galt, county of Sacramento.

According to the testimony of the plaintiff, he paid to the Milk Company the sum of $10,000 for the fleet of trucks referred to herein, payment being made by deductions from the compensation agreed to be paid for the collection and transportation of the milk products. The agreement between the plaintiff and the Milk Company to which we have just referred expired on the 31st day of December, 1933.

After the passage by the legislature, and approval by the Governor of the Transportation License Tax Act to which we

have referred, it appears that the plaintiff had a conversation with two of the officers of the Milk Company in relation to the additional expenses which would be imposed upon him as an independent contractor in collecting milk products for the Milk Company. In this conversation it appears that the plaintiff stated, among other things, that the rate of his compensation policy had been raised from $2.62 to $7.81. He also mentioned the fact that the license tax would cost a considerable sum of money, which by the record is shown to have been in excess of $1,000, being 3 per cent on the gross income of his earnings as an independent contractor. The plaintiff stated to the officers of the company that he could not operate under the agreement which expired, as we have stated, on December 31, 1933, and that he wanted some arrangement made by which his operating expenses could be reduced, or that he should receive additional compensation. The testimony of the plaintiff in this respect is as follows: "A. It was along in the summer we talked about it, Mr. Reider and I, and I think it was brought to Mr. Meyer's attention, too; I know definitely that I brought it to Mr. Meyer's attention, and I wanted some action on it sometime in November. Q. You wanted action sometime in November? A. Yes, one way or the other, and when a new contract was to be drawn up by the first of the year, why, so I knew where I was standing. Q. Then did you arrange for this present January 1, 1934, contract? . . . A. Well, I think I made some suggestions. Q. If you know of your own knowledge, who provided the terms of it? A. Well, it was Sego Milk Company had it drawn up; who drew it up I am not sure. Q. But it was the Sego Milk Company contract, was it? A. Yes, I think it was."

The president of the Milk Company, testifying as to how the operating expenses might be reduced, gave the following testimony: "Back in 1933, prior to this agreement here (to which we will hereinafter refer), it was shown by our insurance man that by our leasing or owning our own fleet of trucks we could reduce our insurance rates. Prior to this agreement the insurance rate was $7.81 per hundred. After this agreement we cut the rate to $1.62 per hundred, which meant a saving of a little better than $1100.00 per year; . . . that was on the liability of our employees such as chauffeurs" etc.

Prior to the contract the witness testified that the plaintiff had to pay the insurance. This insurance was paid by the plaintiff, as well as other expenses, out of 12½ cents a hundred compensation paid to him by the Milk Company for collecting milk products.

The record shows that in pursuance of the plan to reduce expenses two agreements were entered into between the plaintiff and the Milk Company, one purporting to be an agreement of employment of the plaintiff by the Milk Company, and the other called "Bailment for Hire", purporting to be an agreement by which the Milk Company hired, for the period of three months, the fleet of trucks then and theretofore belonging to the plaintiff. The agreement purporting to employ the plaintiff to manage the fleet of trucks hired by the Milk Company from the plaintiff is dated January 1, 1934. It purports to employ the plaintiff by the Milk Company and to pay him therefor the sum of 12½ cents per hundred weight. The portion of the contract purporting to employ the plaintiff and fix his compensation and duties is set forth in the following language: "Second party has had years of experience in the operation and conducting of this business, and he hereby represents that he can efficiently operate said department at a cost of not to exceed twelve and a half cents per cwt. It is therefore agreed that the said sum of twelve and a half cents per cwt. for all milk or cream transported and delivered in good condition at said plant, as aforesaid, shall semi-monthly be set aside by first party as a fund to pay the cost of the operation of said department, which said fund shall be disbursed by first party in the following manner, to-wit: A. Pay the current rentals due for the use of all trucks rented by first party for the transportation of said milk and cream. B. Pay all wages due said truck drivers. C. Pay premiums on compensation insurance, public liability, property damage, fire and theft, and cargo insurance and other incidentals necessarily incurred in the operation of said department. D. Pay current bills incurred for gas and oil used in the operation of said trucks. E. Any and all funds remaining out of such funds shall semi-monthly be paid to second party as additional salary for the service rendered and to be rendered as such manager."

The instrument called "Bailment for Hire" also bears date of January 1, 1934. By its provisions the plaintiff purports

to lease to the Milk Company the fleet of trucks owned by him for the period of three months, receiving therefor a rental of 4½ cents per hundred weight of milk hauled, the agreement being that the trucks are to be used solely for the purpose of collecting milk. The party of the first part in the "Bailment for Hire" instrument agrees to keep the trucks in good repair, furnish necessary tires, parts and accessories, and to maintain fire and theft insurance, and to pay all taxes levied or assessed against the property. The "Bailment for Hire" contract appears to have been renewed from time to time as the three months' term expressed therein would expire.

The court found that the sum of 12½ cents per hundred weight, set aside as the fund for paying the plaintiff under the contracts of January 1, 1934, were overdrawn in the sum of about $1200 at the time of the trial of the action; that the plaintiff had been drawing down the sum of $175 per month as salary, although the record failed to show any agreement as to the payment of any salary by the Milk Company to the plaintiff, it being provided that whatever was left of the 12½ cents per hundred weight compensation mentioned in the agreement should be and become the property of the plaintiff.

The court also found that the milk collected did not become the property of the Milk Company at the time it took charge of the same at the respective ranches where delivery of the milk was made by placing the same upon the trucks operated by the plaintiff. All the testimony in the record, however, is to the effect that the title to the milk vested in the Milk Company immediately upon its taking possession thereof and placing the same upon its trucks, whether operated by the plaintiff as an independent contractor or as an employee of the Milk Company, all the expenses of transportation being paid by the Milk Company, as well as cargo, insurance, etc.

The record shows that the same price was paid for all milk whether delivered by the farmers to the company at its plant in Galt, or whether collected by the plaintiff, and that there remained nothing to be done after taking possession of the milk save to weigh and test the same at its plant for the purpose of determining the price to be paid the producer therefor.

■ Under the provisions of sections 337 et seq., 55 C. J., page 537, where only the price to be paid is to be determined, it becomes a matter of intention of the parties as to when title passes, and the testimony in the record all being to the effect that title passed upon taking possession of the milk, it must be held that the finding of the court in this particular is not sustained by the testimony. However, we do not deem this material to a determination of the case, for the simple reason that if the plaintiff was an independent contractor, he would be liable for the payment of the license tax, irrespective of the ownership of the milk products that he was transporting.

■ The vital findings upon which the judgment of the court rests are numbered XIV and XV, which we here set forth in full:

"XIV.

"That the said agreements made by said B. F. Boessow and said Sego Milk Products Company, dated January 1, 1934, and marked 'Exhibit D' of the complaint herein, and also the agreements between said parties entitled 'Bailment for Hire' marked 'Exhibit D' of the complaint herein, and dated April 1, 1934, and July 1, 1934, were not executed, carried out, worked under, performed or observed by said parties thereto, and said parties did not operate or work in accordance therewith; that the rental charge in said agreements existed in form only; that plaintiff in said agreement was not an employee, but was in fact an independent contractor; that the relationship between the parties to said contract is the same as existed between them under the first contract executed by them in the year 1932, which was received in evidence and marked 'Plaintiff's Exhibit No. 8', and also hereinabove set forth; that said agreements entered into by said parties on January 1, 1934, April 1, 1934, and July 1, 1934, were made with the purpose and intent of avoiding payment of the tax provided for by said Statutes of 1933, Chapter 339, without in fact changing the relation of plaintiff B. F. Boessow with the said Sego Milk Products Company from that of an independent contractor engaged in the transportation of property for hire or compensation over the public highways of this State, to that of an employee of said Company; that said agreements of 1934 were mere subterfuges in form to avoid and circumvent the payment of said tax without in fact changing the relationship theretofore exist-

ing between said parties, and that said contracts were not made by said parties in good faith.

"XV.

"That the charges made in said contracts executed in the year 1934, as rentals and charges did not differ in result or effect from those made in the first contract, and were made for the purpose of appearing to make a change in the relationship of the parties thereto, and were executed by them with the intent of not performing or carrying out the terms thereof, but with the intent that said agreements should exist in form only."

Our attention has not been called to any testimony in the record indicating that the foregoing findings of the court are not sufficiently supported, which, of course, would justify the conclusion that the arrangement between the plaintiff and the Milk Company was merely one of form and not of substance, and that the plaintiff still remained an independent contractor liable for the payment to the state of the license tax, as provided for by the act of the legislature, *supra*. It may be noted that the so-called "Employment Agreement" and the "Bailment for Hire" instruments provided, one for the payment of fire and theft insurance, by the plaintiff, and the other for the payment of fire and theft insurance by the Milk Company.

While the courts hold, and the law seems to be well settled, that there is no moral turpitude in arranging one's business so as to evade taxation, it must be more than a mere colorable transaction. (61 C. J., p. 173, sec. 130.)

In reading the whole of the transcript, including the agreements, the following excerpt which we take from the opinion of the trial court, sets forth what we think a correct statement of the situation:

"When we consider the terms of the previous written agreement between the parties whereby Boessow did the hauling of the milk on a basis of 12½ cents per cwt. and the present plan whereby the same result is accomplished through the bailment for hire agreements and the so-called employment agreement, we are constrained to wonder whether after all the relationship between the parties is not now exactly the same as it was when the written agreement of hauling existed between them, and if the plan set forth is not merely form rather than substance,—in other words, whether it does not

exist merely on paper rather than in fact. But it is argued that this is not a fact, for there is a rental of the trucks and, in fact, it is quite beneficial to both sides aside from the payment of the transportation tax, for a considerable saving is had on the matter of insurance, as heretofore indicated. Again, it is pointed out that even though it might be contended that the purpose was to avoid or dodge the transportation tax, still this is perfectly legitimate. In this regard plaintiff cites a number of cases, all being to the same effect, among which is *Helvering* v. *Gregory,* 69 Fed. Rep. (2d) p. 809, which illustrates the principle invoked. Therein the court states: 'We agree with the Board and the tax payer that a transaction, otherwise within the exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade taxation. Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.'

"Correctly applied, there can be no just complaint of the rule so announced; *however, the underlying facts, rather than the mere form of the transaction, must be given full consideration.*

"It may be that some arrangement might be thought out whereby an employee could be paid a certain sum for his services based upon the amount of milk which was hauled by trucks under his management as such employee; *but the agreements under consideration, under close analysis, do not seem to be of this nature.* A fund equal to 12½ cents per cwt. *of the milk hauled* is set aside and out of this fund certain expenses are to be paid. Certainly it cannot be denied but that the 12½ cents covers hauling charges, although of course it takes care of other expenses, including the *wages* or profit of plaintiff. *In view of the wording of this feature of the agreement it might well be contended that the parties have created a trust fund for certain purposes, which, as explained above, includes the hauling charges.* If the plaintiff was merely an employee of the Sego Company why was it necessary to set up such a fund? Why did the Company itself not pay for 'wages' due said 'truck drivers', 'premiums, etc.' 'current bills incurred for gas and oil used in the operation of said trucks'? (Agreement, pars. B, C and D.)"

While, as we have said, one may, without moral turpitude, arrange his business so as to lessen the burden of taxation, it must be *bona fide*, and not merely colorable. Here, as stated by the trial court, the same results are sought to be attained as were achieved under the first contract which existed between the plaintiff and the Milk Company. The same duties were to be performed by the plaintiff for an identical compensation, and taken in connection with the testimony of the plaintiff himself that he was simply seeking an arrangement to avoid his expense of operation, we think the trial court was justified in coming to the conclusion that the contracts referred. to herein as the "Agreement of Employment" and the "Bailment for Hire" were matters of form and not of substance.

The judgment of the trial court is affirmed.

Pullen, P. J., and Thompson, J., concurred.