[Civ. No. 22446. First Dist., Div. One. Nov. 24, 1965.]

AUTOMATIC CANTEEN COMPANY OF AMERICA, Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendant and Appellant.

J. Joseph Sullivan, Edward Stevens and Jule N. Kvamme for Plaintiff and Respondent.

MOLINARI, J.—This action was brought by Automatic Canteen Company of America, as successor to Nationwide Food Service, Inc. (hereinafter referred to as Nationwide), seeking the refund of $60,479.35 paid by Nationwide as sales taxes for the period of December 21, 1952 through March 14, 1959, these sales taxes having been paid on the gross receipts of Nationwide's in-plant feeding operations at Shell Chemical Corporation, Shell Oil Company, Carnation Company, Standard Oil Company of California, Norris-Thermador Corpora-

tion, and Dohrmann Hotel Supply Company. Judgment in the sum of $39,586.09 was awarded Nationwide and it is from this judgment that defendant State Board of Equalization appeals.[1]

## The Issues

Section 6051 of the Revenue and Taxation Code[2] imposes an excise tax upon retailers for the privilege of conducting a retail business, measured by gross receipts from retail sales.[3] Section 6006, subdivision (d), in defining the term " 'Sale,' " includes "The furnishing, preparing, or serving for a consideration of food, meals, or drinks," and section 6007 defines a " 'Retail sale' " as "a sale for any purpose other than resale in the regular course of business. . . ." The initial issue raised by this appeal is whether Nationwide's activities in the preparation and serving of food at the employee cafeterias of the four companies involved in this appeal are properly characterized as the making of retail sales. As a second issue, Nationwide contends that in the event that it was the retailer of the food prepared and sold at these four plants, its gross receipts from these operations were exempt from sales tax under section 6363, which, during the period here involved,

---

[1]The notice of appeal states that the appeal is "from that portion of the Judgment entered herein which awards to plaintiff the sum of $39,586.09, plus interest, as a refund of sales taxes paid with respect to plaintiff's operations concerning Shell Oil Company, Shell Chemical Corporation, Carnation Company and Standard Oil Company of California" and that "Defendant does not appeal from that portion of the Judgment which denies plaintiff a refund of sales taxes paid with respect to plaintiff's operations concerning Norris Thermador Corporation and Dohrmann Hotel Supply Company." The judgment ordered by the court, however, made no such apportionment nor reference thereto, but simply ordered that "plaintiff have judgment against defendant in the sum of $39,586.09" plus interest and costs. We note, however, that in its "Findings of Fact and Conclusions of Law" the trial court found that Nationwide was entitled to the sum of $39,586.09 as a refund of sales taxes paid with respect to its operations at Shell Oil, Shell Chemical, Carnation, and Standard Oil, but that it was not entitled to a refund for sales taxes paid with respect to its operations in connection with Norris-Thermador and Dohrmann.

[2]Unless otherwise indicated, all statutory references are to the Revenue and Taxation Code.

[3]Specifically this section provides as follows: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of 2½ percent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this State on or after August 1, 1933, and to and including June 30, 1935, and at the rate of 3 percent thereafter, and at the rate of 2½ percent on and after July 1, 1943, and to and including June 30, 1949, and at the rate of 3 percent thereafter."

provided for such an exemption as to food served by employers to their employees.[4]

## The Record

At the trial Nationwide introduced into evidence the contracts between it and the six companies at whose office buildings and plants it performed its operations. In addition, Nationwide produced four witnesses, each an employee of one of the following named companies at which Nationwide had contracted to perform its in-plant feeding services, to wit: Shell Chemical, Shell Oil, Carnation and Norris-Thermador. Each of these witnesses testified concerning Nationwide's operations at the particular location with which he was familiar. No witnesses were called to testify as to the Standard Oil and Dohrmann operations.

During the years here in question Nationwide was a Delaware corporation engaged in California and in other states in the business of industrial catering and in-plant feeding. In its "Application for Permit to Engage in Business as a Seller of Tangible Personal Property and Registration as a Retailer," Nationwide listed its "Kind of business" as "Retail-Industrial Restaurants." As part of its business activities, Nationwide was involved in the operation of cafeterias, executive dining rooms, and canteens at the six locations around which the trial below evolved, namely, (1) Shell Chemical's plant in Torrance, (2) Shell Oil's office building on Sixth Street in Los Angeles, (3) Carnation's office building on Wilshire Boulevard in Los Angeles, (4) Standard Oil's office building on Olympic Boulevard in Los Angeles, (5) Norris-Thermador's plant in Los Angeles, and (6) Dohrmann's office building in Culver City.[5] As to several of these companies, it was established at the trial that they maintained eating facilities for their employees in their plants for the reason that there were either no restaurants in the vicinity or the existing restaurants were too expensive or could not properly accommodate the employees.

Concerning the nature of Nationwide's operations at the

---

[4]This section provides in pertinent part as follows: "There are exempted from the taxes imposed by this part the gross receipts from the sale of . . . meals and food products for human consumption served by employers . . . to the employees engaged in work upon a particular project or undertaking." By a 1963 amendment to section 6363, such gross receipts are no longer exempted from the sales tax.

[5]We refer hereinafter to these companies as the "Employers."

six locations involved in the instant action,[6] the following evidence was adduced at the trial:

As to all six operations, Nationwide operated pursuant to a written contract with the particular employer. In the cases of Norris-Thermador and Dohrmann, the contract was prepared on Nationwide's standard form agreement and provided in part that "The Owner hereby grants to Nationwide as an independent contractor the exclusive right and license to sell and dispense within such parts of the Plant as may be mutually agreed upon, food, ice cream, candy, gum, nuts, nonalcoholic beverages, tobacco products and such other products as may be permitted by the Owner to be sold within the Plant"; that "Nationwide will at all times furnish proper hot and cold foods and food service to the employees of the Owner in the above-described cafeteria and other facilities, and shall serve food to the employees of the Owner during such feeding periods for each shift as may be designated by the Owner"; and that Nationwide would be reimbursed for its costs and should receive in addition 5 percent of its gross sales with a guaranteed minimum.

The remaining four contracts were not prepared on Nationwide's standard form contract. The contract with Standard Oil provided in part that "Nationwide shall provide such supervisory assistance in the operation of . . . [Standard Oil's] Dining Room and Cafeteria as may be necessary, in Standard's opinion, for its efficient operation"; that "Nationwide, on behalf of Standard, shall procure such materials and foodstuff, and shall provide such supervision of the preparation, service and sale thereof by Standard employees, as may be reasonably necessary in Standard's opinion for the proper and efficient operation of such Dining Room and Cafeteria in relation to the number and quantity of meals served therein"; that "Standard shall collect all gross receipts from sales of food in such Dining Room and Cafeteria and shall turn over to Nationwide daily the gross receipts from such sales to defray Nationwide's costs hereunder"; that "Any amount of such gross receipts in excess of the cost of business . . . shall be retained by Nationwide as compensation for services ren-

[6]Although, as we have indicated, only four of these operations are actually involved in this appeal, we include a description of Nationwide's activities in relation to Norris-Thermador and Dohrmann in order to compare Nationwide's operations at the plants which are the subject of this appeal with those for which Nationwide was held liable for the payment of a sales tax.

dered hereunder, but Standard agrees to pay Nationwide the difference, computed during any four-week accounting period, between the amount of such compensation and $100''; that ''In no event shall Standard's liability hereunder for any such four-week period exceed $100''; and that ''Nationwide shall bear all costs of operations in excess thereof and shall hold Standard harmless from all claims therefor.'' The term ''Cost of Business'' in said contract was defined to include the actual cost of direct labor, including payroll taxes and benefits to Standard's employees working in the dining room and cafeteria; the actual cost of materials and supplies required in the operation of the dining room and cafeteria; and an overhead charge of $3\frac{1}{2}$ percent of the gross receipts, with a minimum of $150 per accounting period. The term ''Gross Receipts'' was defined in the contract to mean ''total cash receipts from actual sales of food in such Dining Room and Cafeteria. . . .'' The Standard contract provided, further, that ''Nationwide shall perform its obligations hereunder as an independent contractor''; that Standard would provide and maintain and repair the dining room and cafeteria equipment and facilities; that Nationwide would supervise use of such equipment; that Nationwide would replace expendable equipment, such as china, crockery, glass tableware and kitchen utensils, the cost thereof to be charged as a ''cost of business''; that such replacements were to become the property of Standard; that Standard would furnish all utilities necessary for the operation of the dining room and cafeteria; that the operating hours, menus, prices and sizes of portions of food would be those in effect at the date of the contract and the same could not be changed without Standard's consent; that Nationwide would carry workmen's compensation insurance on its own employees and would carry product liability insurance insuring Standard and Nationwide with insurance companies and with limits satisfactory to Standard, the premiums on the latter policy to be charged as a ''cost of business''; that Standard had ''the sole right to employ, discharge or transfer all individuals assigned to work in such Dining Room and Cafeteria, except supervisory staff employed and paid by Nationwide''; that the wages and benefits of Standard's employees were to be determined by Standard at its discretion and the salaries and wages of such employees, including taxes and benefits, were to be charged to ''cost of business''; that Standard employees were to be under the direct supervision of Nationwide's managerial staff as to the manner in which

foods were to be prepared and served, and no employees of Nationwide were to prepare or sell meals; that Nationwide was to maintain "accurate records of all inventories, receipts, costs and disbursements in connection with the supervision and operation of such Dining Room and Cafeteria" subject to inspection and audit by Standard; that Standard was to invoice Nationwide on a calendar month basis for salaries, wages, payroll taxes and employee' benefits applicable to Standard's employees; that at specified accounting periods Nationwide was to give Standard a statement showing gross receipts, cost of business and net profit or loss, resulting from operations of the dining room and cafeteria; and that Nationwide would procure all licenses and permits, on behalf of Standard, for the operation of the dining room and cafeteria, the cost thereof to be charged to "cost of business. . . ."

The record further discloses that Nationwide's contracts with Shell Oil, Shell Chemical, and Carnation were all phrased in terms of "sales for resale" and "services." The relevant provisions of the Shell Oil contract, which provisions are paralleled in the Shell Chemical and Carnation agreements, consist of the following: "1. Nationwide shall, at all times designated by Shell, prepare and sell to Shell such food items as may be requested by Shell for use in the operation of said restaurant and Shell shall resell such food items at such prices as it shall in its sole discretion determine. 2. Nationwide shall, at all times designated by Shell, provide such services relative to the management and operation of said restaurant as may be requested by Shell. . . . 4. Shell hereby authorizes Nationwide to collect on Shell's behalf the prices charged by Shell for the resale of all food items sold in said restaurant and the commissions from sales of products made from all vending machines in said Premises." In addition, in these three contracts, Nationwide agreed to carry on its operations on a "cost plus guaranteed profit" basis. The Shell Chemical contract also contained the specific provision that "It is understood and agreed that Nationwide is an independent contractor and that its employees are subject to its complete direction and control. . . ."

With respect to the three last-mentioned contracts the record discloses that the respective plants were operated as follows: The Employers owned, furnished and maintained the cafeteria premises; Nationwide did not lease the premises or pay any rent. The Employers furnished the utilities necessary to

the operation of the cafeterias; furnished and maintained the equipment in the cafeterias; bore the cost of replacement of all china, crockery, glass and tableware and kitchen utensils; and determined the hours at which the cafeterias were to be operated. Nationwide secured the necessary licenses and permits for the operation of the cafeterias. Nationwide furnished the employees for the operation of the cafeterias except that at the Carnation plant Carnation employees helped with the dishwashing and service, as did employees of the Benton Management Corporation, an independent corporation retained by Carnation for custodial functions. Finally, at all the plants, Nationwide's employees had to meet standards established and enforced by the Employers. Nationwide carried public liability, product liability, property damage and workmen's compensation insurance and paid all taxes assessed against its business on the Employers' premises. Nationwide planned the meals and prepared the menus, which were subject to approval by the Employers both as to content and price. Nationwide, in its own name and on its own credit, purchased the food to be served in the cafeterias; however, its choice of purveyors was subject to the approval of the Employers. Nationwide cooked the meals and otherwise prepared the food; served the food; and collected the sales price in cash from the patrons of the cafeterias, except that in the executive dining room portion of Nationwide's operation at the Carnation building the customer was allowed to sign a ''slip'' and have the total of these ''slips'' subtracted from his paycheck at the end of the month. The slips were collected by a Carnation employee, and through periodic accountings the amounts so collected were transmitted to Nationwide. Although the contracts anticipated that Nationwide would retain the cash receipts from its operations in its own accounts pending the end of the accounting period, Nationwide offered testimony at the trial to the effect that the receipts were turned over to the Employers' cashiers' office at the end of each day to be held pending the end of the accounting period, at which time the monies due Nationwide were paid to it.[7]

---

[7] We note by way of comparison that the operations mentioned with respect to Shell Oil, Shell Chemical and Carnation were essentially the same as those carried on at Norris-Thermador and Dohrmann which operated under the standard form contract, except that as to Norris-Thermador the record discloses that the Employer supplied its own personnel to assist during peak hours and that the meals were paid for by the employees in the form of a meal ticket which the employee had previously purchased from the Employer.

## Scope of Review

Since the issues here involve the applicability of taxing statutes to uncontradicted facts,[8] we are confronted purely with a question of law and are not bound by the findings of the trial court.[9] (*Peterson Tractor Co. v. State Board of Equalization*, 199 Cal.App.2d 662, 668 [18 Cal.Rptr. 800]; *Bank of America v. State Board of Equalization*, 209 Cal. App.2d 780, 793 [26 Cal.Rptr. 348]; *Whittell v. Franchise Tax Board*, 231 Cal.App.2d 278, 283 [41 Cal.Rptr. 673]; *Pacific Pipeline Constr. Co. v. State Board of Equalization*, 49 Cal.2d 729, 736 [321 P.2d 729].)

## Nationwide as the Retailer

Respondent concedes that since the employees of the respective Employers paid for and consumed the food, they were the buyers in a retail sales transaction. The crucial issue in the present case, therefore, is: Who was the retail seller, Nationwide or the Employers?

Although under section 6014, a "Seller" includes every person engaged in the business of selling tangible property of a kind the gross receipts from the retail sale of which are required to be included in the measure of the sales tax, in order for a seller to be liable for sales tax under section 6051 he must not only be the recipient of gross receipts, but he must have received these receipts as a retailer from retail sales. (See § 6051; and see §§ 6012 and 6015.) As already pointed out a " 'Retail sale' " or " 'Sale at retail' " means a sale in the form of tangible personal property for any purpose other than resale in the regular course of business. (§ 6007.) In the instant case the tangible personal property consisted of

---

[8]Although counsel for defendant cross-examined plaintiff's witnesses, no testimony or evidence was offered by defendant to dispute any of the facts proved by Nationwide. Notwithstanding such cross-examination, the essential facts of the case remained undisputed.

[9]The findings of fact and conclusions of law entered by the trial court were to the effect that "as to the operations concerning Shell Oil Company, Shell Chemical Corporation, Carnation Company and Standard Oil Company of California, each being an employer, that said employers are and each is a retailer and that under the provisions of section 6363 of the Revenue and Taxation Code the gross receipts of said operations are exempt from sales tax as meals and food products served by employers to their employees at the site of said operations; that as to operations concerning Norris-Thermador Corporation and Dohrman [*sic*] Hotel Supply, each being an employer, that said employers were not retailers, that plaintiff is the retailer; . . . that the gross receipts of said operations are not exempt from sales tax as meals and food products served by employers to employees.''

food, meals or drinks, the sale of which consisted in the furnishing, preparing or serving of these items for a consideration. (§ 6006, subd. (d).)

In support of its contention that the food items it prepared were furnished and served to the respective Employers for purposes of resale to their consumer employees, Nationwide places great reliance upon the terminology of the contracts entered into between it and the four Employers involved in this appeal. It should be pointed out initially that of these four contracts only three were cast in the form of "sales for resale." The contract between Nationwide and Standard Oil instead provided that Nationwide agreed to furnish "supervisory assistance" to Standard Oil in the operation of its employee cafeterias.

It is well settled that a taxpayer has the legal and moral right to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits. (*Edison California Stores, Inc.* v. *McColgan,* 30 Cal. 2d 472, 476 [183 P.2d 16]; *Pioneer Express Co.* v. *Riley,* 208 Cal. 677, 687 [284 P. 663]; *Boessow* v. *Johnson,* 10 Cal.App. 2d 578 [52 P.2d 505]; *Helvering* v. *Gregory,* 69 F.2d 809; 51 Am.Jur., Taxation, § 10, p. 43; 46 Cal.Jur.2d, Taxation, § 51, p. 540.) "A legal transaction will not be denied its intended effect although an underlying motive may have been the evasion of taxes, but the transaction may always be scrutinized to see whether it is in reality what it appears to be. Substance and not form will control. When the purpose of a taxpayer, at least in part, is to evade taxes, the court should examine with particular care the forms used by him for the accomplishment of his purpose, and if his ingenuity fails at any point, should not lend him its aid by resolving doubts in his favor." (51 Am.Jur., *supra,* pp. 44-45, fns. omitted.) As stated in *Boessow,* " 'the underlying facts, rather than the mere form of the transaction, must be given full consideration.' " (Italics omitted; p. 585.) Accordingly, the question in each instance is whether the transaction under scrutiny is in fact what it appears to be in form. (*Chisholm* v. *Commissioner of Internal Revenue,* 79 F.2d 14, 15 [101 A.L.R. 200].)

Thus, while the parties may properly enter into a written contract the provisions of which are intended to lessen or avoid the burden of taxation, the transaction must be bona fide and not colorable; and if the contractual provisions purporting to accomplish the avoidance of taxes are merely matters of form and not of substance, a court is justified in deny-

ing the transaction its intended effect. (*Boessow* v. *Johnson, supra*, pp. 585-586.)

 Scrutinizing the instant transaction in the light of the underlying facts, we are satisfied that the subject contracts, insofar as they label the transactions between Nationwide and the Employers as "sales for resale," did not in reality deal with "sales for resale," but were merely an attempt to put form above substance in an effort to relieve Nationwide of the payment of sales tax for which it would otherwise be liable.[10] While these contracts provided that Nationwide would sell the subject food items to the Employers, the record discloses that no such sale was made to the Employers but that the items of food were sold directly to the consumers. These contracts not only contemplated that Nationwide would operate the cafeterias and serve the meals to the employees, but they specifically authorized Nationwide to make the "resale" transaction. It is apparent from a reading of these contracts, moreover, that the Employers would never actually take title to or possession of the food involved and that Nationwide would make the sales directly to the cafeteria customers. The record discloses that Nationwide purchased food supplies from purveyors of its own choice from whom it took title and ownership of these items. Through its employees, who were under its control and direction, Nationwide prepared these items into the form necessary for consumption by the consumer. When so prepared they were held out for sale by Nationwide to the cafeteria customers and, when purchased by the latter, were *directly* served by the employees of Nationwide to the consumer of the meal who paid the consideration therefor to Nationwide. We thus have not only a "sale" of meals as provided for in section 6006, subdivision (d), but a sale by Nationwide of the meals at retail. Under the status of the record there was no sale to the Employers, but the only

---

[10]From a comparison of these contracts with Nationwide's standard form of contract (i.e., the contracts with Norris-Thermador and Dohrmann as to which the trial court denied a refund) we note that the latter clearly contemplated that Nationwide would be the retailer of the meals which it served on the Employer's premises. This contract granted to Nationwide the exclusive right and license to sell and dispense food and food products to employees in certain areas of the Employer's plant or office building. Nothing in this contract purports to deal with sales by Nationwide to the Employer or sales by the Employer to its employees. Comparing this contract with the three which were worded in terms of "sales for resale" we note, further, that, aside from the "sales for resale" provisions, the substantive provisions of the latter contracts were virtually identical with those in the standard form contract.

sale, in fact, was that made directly by Nationwide to the consumer of the meal. Under these circumstances we fail to see how Nationwide can legitimately argue that the food items it prepared were furnished and served to Shell Oil, Shell Chemical and Carnation for purposes of resale to the consumer employees of these Employers.

Adverting to the Standard Oil contract, we note that while it was not couched in terms of "sales for resale," it, too, constituted an attempt to put form above substance in an endeavor to avoid the payment of sales tax by Nationwide. Since no evidence was adduced with respect to the Standard Oil operation other than the contract itself, we must view this operation solely in the light of the contractual provisions. Although this contract purports to characterize the activities of Nationwide as supervisory, it is clear from the terminology of the contract that the retail sale of the meals to Standard's employees was in fact made by Nationwide notwithstanding, as in the case of the other three contracts under scrutiny, that the equipment and facilities were furnished and supplied by the Employer. It is clear from the Standard contract that Nationwide purchased the food supplied and materials required for the operation of the dining room and cafeteria from purveyors of its own choice; that it took title and ownership of these items; and that it charged Standard for the actual cost thereof, including sales and use taxes and delivery charges, as a cost of the business *conducted* by Nationwide. Although, unlike the other contracts, the employees who prepared and served the meals were employees of Standard, they were required under the contract to prepare and serve the food under the direct supervision of Nationwide's managerial staff and in the *manner* directed by Nationwide. It is significant to note that while these employees were employed by Standard and were subject to discharge by Standard, they were, insofar as the preparation and service of the food were concerned, under the control and direction of Nationwide for all intents and purposes as if they were in fact the employees of the latter. Their compensation, including payroll taxes and employee' benefits, was in fact paid by Nationwide since, under the contract, the "Actual cost of direct labor, including payroll taxes and benefits" was chargeable to Standard as a cost of Nationwide's business conducted in connection with the subject operation.

That Nationwide's activities were more than supervisory and consisted in the actual *operation* of the dining room and

cafeteria is further demonstrated by the provisions of the contract which required that Nationwide carry and pay for product liability insurance "insuring Standard and Nationwide in connection with the *operation* of such Dining Room and Cafeteria"; that Nationwide procure "all licenses and permits required for the *operation* of such Dining Room and Cafeteria and in performing its obligations hereunder shall comply with all applicable ordinances, regulations and statutes"; and that "Nationwide will maintain accurate records of all inventories, receipts, costs and disbursements in connection with the supervision and *operation* of such Dining Room and Cafeteria while this agreement is in effect. . . ." (Italics added.) We are not unmindful of the contract provision that the gross receipts from the sales of food were to be collected by Standard, but we take particular note that this provision reads as follows: "Standard shall collect all gross receipts from sales of food in such Dining Room and Cafeteria *and shall turn over to Nationwide daily the gross receipts from such sales to defray Nationwide's costs hereunder.*" (Italics added.) This provision, when coupled with that providing that Nationwide "shall give Standard daily a written receipt for the amount of money so received," is another indication of an attempt to put form above substance since it is obvious that for all intents and purposes the daily receipts from the sales of food were actually received by Nationwide. In sum, under the status of the record there can be no doubt that within the meaning of the applicable statutes the food was prepared and served under the direction and control of Nationwide and that under the circumstances, a sale at retail of the food was in fact made to the consumer by Nationwide, the actual operator of the subject dining room and cafeteria.

As an alternative basis for upholding the judgment of the trial court Nationwide argues that to the extent that it may have participated in any retail sales transactions, it was acting not as an independent contractor but as an agent of the Employers. Since an independent contractor may also be an agent, and since the antithesis of "independent contractor" is "employee" or "servant" (see Rest. 2d Agency, §§ 2, 14N), the basis of Nationwide's argument is unclear. It is conceded by Nationwide in its brief on appeal that defendant is entitled to prevail in this case "if Nationwide acted as an independent contractor in performing all of the essential

functions at the Employers' cafeterias; that is, if Nation-
wide purchased food items directly from suppliers for resale
by Nationwide to the employees of the Employers.'' While
Nationwide's argument is couched in terms of ''agency'' it
is apparent that if Nationwide was not an ''independent con-
tractor'' or an ''independent contractor-agent'' then it
must have been an ''employee'' or an ''employee-agent'' in
its dealings with the Employers. Before proceeding to
discuss the relationship between Nationwide and the Em-
ployers in the light of the subject contention it should be
pointed out that sales made by employee-agents are con-
sidered to be sales made both *for and by* their principals, as
distinguished from sales made by independent contractor-
agents which are made *for, and not by,* their principals. (See
*Irvine Co.* v. *McColgan,* 26 Cal.2d 160, 163-166 [157 P.2d 847,
167 A.L.R. 934].)

We doubt that the relation of master and servant may
exist between corporations since this ''would seem to be a
misconception of the relation of master and servant. . . .''
(*Kourik* v. *English,* 340 Mo. 367 [100 S.W.2d 901, 905].)[11]
 Assuming *arguendo* that a publicly-held corporation
such as Nationwide can, under any circumstances, be an
employee or servant, the record in this case belies any notion
that Nationwide was such an ''employee'' of the Employers.
On the contrary, the undisputed facts in the present case,
narrated and discussed above, clearly indicate that Nation-
wide was an independent contractor which was a retailer
both in fact and in law.

 The important factor in distinguishing an employee
from an independent contractor is the right of control by the
employer. ''An independent contractor is one who
renders service in the course of an independent employment
or occupation, following his employer's desires only as to the
results of the work, and not as to the means whereby it is to
be accomplished.'' (*McDonald* v. *Shell Oil Co.,* 44 Cal.2d
785, 788 [285 P.2d 902]; see also Lab. Code, § 3353; *Green* v.
*Soule,* 145 Cal. 96, 99 [78 P. 337]; Rest.2d Agency, § 220
(2)(a).) Elaborating on this test of control, the court in the
*McDonald* case stated as follows: ''However, the owner may

---

[11]There is authority to the effect that the relation of master and ser-
vant may exist between corporations as well as between individuals
(*Alabama Power Co.* v. *Bodine,* 213 Ala. 627 [105 So. 869]; *McWilliams*
v. *Detroit Cent. Mills Co.,* 31 Mich. 274; see 19 C.J.S., Corporations,
§ 953, fn. 52).

retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship.'' (P. 790.)

Applying these principles to the undisputed facts of the instant case, we are satisfied that as a matter of law it can be held that Nationwide performed its operations at the various employee cafeterias as an independent contractor since it is clear that in performing its services of preparing and serving meals to the Employers' employees Nationwide followed the Employers' desires only as to the results of the services and not as to the means whereby they were accomplished. While the Employers did, it is true, exercise a relatively broad degree of control over Nationwide's activities, this control was concerned with the results of Nationwide's work rather than the manner and means by which it was to be accomplished.

Further support for the conclusion that the relationship between Nationwide and the various Employers was that of independent contractor and owner rather than that of employee and employer is found in various secondary tests often used by the courts in distinguishing an independent contractor from an employee. These tests are enumerated in section 220(2) of the Restatement Second of the Law of Agency, and have been adopted by the California Supreme Court in *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43-44 [168 P.2d 686], as follows: ''(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or

not the parties believe they are creating the relationship of employer-employee.''

The application of these tests to the facts of the present case is as follows: As to tests (a), (b) and (c) it is obvious that the restaurant and food service business comprises a distinct category of business enterprise. Feeding establishments are traditionally operated as separate businesses rather than as a minor adjunct of some other business. Nationwide itself, whose sole business was operating food establishments, is a typical example of such a business. In addition, it is clear that the operation of restaurants requires a large degree of skill and is usually performed by persons who specialize in this field. In fact, it is obvious that the primary reason that Nationwide acquired the right to operate the employee cafeterias involved in this action was because Nationwide had this specialized skill.

As to test (d), while the Employers furnished the cafeteria premises and facilities to Nationwide, this factor is not significant since there was no real alternative because by their very nature, the employee cafeterias operated by Nationwide were required to be located on the Employers' premises. Concerning factor (e), the Restatement comments that ''If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him.'' (P. 490.) However, since in the instant case the serving of meals to their employees was a service which the Employers had chosen to provide on a permanent basis, we are of the opinion that the fact that Nationwide performed its operations at the various cafeterias for an extended period of time should not be determinative of the nature of its relationship with the various Employers. With respect to test (f), the fact that Nationwide was paid on a ''cost-plus-guaranteed-profit'' basis again tends to show that Nationwide was an independent contractor rather than an employee. Whereas employees are typically paid on a time piece basis, ''cost-plus'' is a typical method of paying an independent contractor. As regards test (g), it is clear that the operating of cafeterias is in no way a part of the regular business of the Employers involved in this action.

Finally, as to factor (h) and concerning the intent of the parties as to the nature of their relationship, we note that both the Shell Chemical and Standard Oil contracts expressly

provided that Nationwide was an independent contractor. Moreover, with respect to the other two contracts, the fact that they were couched in terms of sales for resale is an indication that it was intended that Nationwide was an independent contractor. In addition, Nationwide's operations under all four contracts involved in this appeal were virtually identical to its operations under its standard form agreement, which also expressly declared that Nationwide was an independent contractor. ■ While it is true that the form of the contract between the parties and the labels used by them are not necessarily controlling and that a contract should be considered not only in view of the circumstances under which it was made, but also in the light of the conduct of the parties while the work is being performed, the form of the contract and the labels used are of some weight in determining the nature of the relationship since the relation is prima facie that expressed by the terms of the writing. (32 Cal.Jur.2d, Master and Servant, § 8, p. 402; *Luckie* v. *Diamond Coal Co.*, 41 Cal.App. 468, 477-479 [183 P. 178]; see *Tomlin* v. *California Emp. Com.*, 30 Cal.2d 118, 123 [180 P.2d 342]; *Anderson* v. *Badger*, 84 Cal.App.2d 736, 742 [191 P.2d 768].) In the present case not only is the relationship of the parties expressed in terms indicating that Nationwide was an independent contractor, but there is nothing in the conduct or acts of the parties inconsistent therewith.

### *The Inapplicability of the Section 6363 Exemption*

■ Nationwide seeks to uphold the trial court's judgment on the basis that even if Nationwide is deemed to be the retailer of the meals involved, its gross receipts from such operations were exempted from the sales tax under the then language of section 6363. By clear language, this exemption was limited to gross receipts from the sales of meals served (i.e., sold) "by employers or employee organizations. . . ." Nationwide was neither the employer of the persons to whom it sold meals nor an organization representing those persons; rather it was a publicly-held corporation engaged in the business of industrial catering, which, for a profit, operated the dining facilities located in the buildings and plants occupied by the Employers. Any argument that the exemption granted by section 6363 should be extended to concessionaires such as Nationwide is contrary to the plain language of the section. Such a construction must, therefore, be avoided. (*Chavez* v.

*Sargent,* 52 Cal.2d 162, 203 [339 P.2d 801]; *Benson* v. *Superior Court,* 214 Cal.App.2d 551, 558 [29 Cal.Rptr. 760].)

Moreover, if the Legislature had desired to extend the exemption to cover concessionaires such as Nationwide it could and would have stated so in plain language. To the contrary, however, the Legislature has twice refused to enact proposed amendments to section 6363 which would have specifically exempted retailers such as Nationwide. In 1953, Senate Bill 1338 was introduced in the Legislature adding the words ''or by persons under contract to such employers or employee organizations.'' That amendment, which clearly would have exempted Nationwide in this case, was not enacted by the Legislature. Again, in 1955, Senate Bill 1819 was introduced in the Legislature proposing to amend section 6363 so as to exempt operations such as here conducted by Nationwide. Again the Legislature, although enacting legislation amending section 6363 in other respects, refused to enact the amendment which would have extended the exemption to persons such as Nationwide.

Finally, the construction which the State Board of Equalization consistently gave to section 6363 prior to its amendment in 1963 was directly contrary to Nationwide's interpretation of this statute.[12] Official Ruling No. 53, as it read during the period here involved, expressly declared that with regard to employee cafeterias, ''tax . . . applies . . . to the sale of meals by a concessionaire or other retailer of meals who is not an employer of persons working on the project. . . .'' (18 Cal. Adm. Code, § 2003, subd. (f).) Under this ruling, the Sales Tax Counsel has stated that a person who, as an independent contractor, furnishes meals at an employee cafeteria is not exempt from sales tax under section 6363. (See Sales Tax Counsel ruling dated February 9, 1953 and March 16, 1959, 3 CCH California Tax Reports, pars. 60-219.47 and .23.) Since we have concluded that Nationwide operated at the various employee cafeterias as an independent contractor rather than as an employee, we

---

[12]To the effect that the administrative construction of a statute by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized, see *Coca-Cola Co.* v. *State Board of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1]; *Whitcomb Hotel, Inc.* v. *California Emp. Com.,* 24 Cal.2d 753, 756 [151 P.2d 233, 155 A.L.R. 405].

accordingly must reject Nationwide's argument that it was entitled to the benefit of the section 6363 exemption.

The judgment appealed from is reversed with directions to the trial court that it enter judgment for defendant against plaintiff. In view of the trial court's findings that plaintiff was not entitled to a sales tax refund as to the Norris-Thermador and Dohrmann operations and the conclusion herein reached that plaintiff is not entitled to a refund as to the other operations herein referred to, it is the intent and purport of this direction that judgment be entered in favor of defendant and against plaintiff as to all of the latter's operations which were the subject of this action.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied December 21, 1965, and respondent's petition for a hearing by the Supreme Court was denied January 19, 1966.