KUSKIN, J.T.C.
Plaintiff Sodexho Operations, LLC (“Sodexho”) provided management services for the food service departments at St. Francis Medical Center (“SFMC”) in Trenton, New Jersey and St. Elizabeth Hospital (“SEH”) in Elizabeth, New Jersey (referred to together in this Opinion as the “Hospitals”) and for the environmental (cleaning) service department at SFMC. Sodexho appeals defendant Director’s assessments of use tax pursuant to the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29 (the “SUT Act”). The assessments relate to Sodexho’s purchases during the period April 1, 1993 through December 31, 1998 of the following: paper goods, such as plates, cups, napkins, straws, and utensils for use in the food service department SFMC; furniture for the SFMC employee dining room; and materials for use in renovations to the SEH cafeteria and coffee shop.[1]
Sodexho contends that it made the purchases as an agent for each of the Hospitals, which were exempt from use tax liability, and, therefore, it is entitled to a derivative exemption. As an alternative basis for relief, Sodexho argues that, if the purchases were not exempt under the Hospitals’ respective exemptions, then the purchases were not subject to tax because they were made for purposes of resale to the Hospitals. As to its purchases of furniture and materials, Sodexho claims an exemption from tax on the additional ground that it acted as a contractor in making the purchases and qualifies for exemption under N.J.S.A. 54-.32B-8.22 *29 (providing an exemption from sales and use tax for purchases by contractors of supplies and materials for use in improving, altering or repairing the real property of specified organizations).
The parties submitted a Stipulation of Facts, which was supplemented by testimony at trial and a deposition transcript, and submitted pre- and post-trial briefs. Based on consideration of all of these submissions and my determinations as to the credibility of the witnesses, for the reasons set forth below I reject Sodexho’s contentions and affirm the Director’s assessments of use tax.
The issues before me are the following:
1. in making the purchases in issue, did Sodexho act as an agent for each of the Hospitals;
2. if Sodexho acted as an agent, is it entitled to a derivative exemption from use tax (the parties have stipulated that each of the Hospitals is exempt);
3. if Sodexho is not exempt from tax as an agent of the Hospitals, did it purchase the paper goods, cleaning materials, and furniture and materials in issue for purposes of resale; and
4. are Sodexho’s purchases of furniture and materials exempt from use tax because Sodexho acted as a contractor in making the purchases.
Each of these issues is highly fact sensitive. Consequently, a thorough explication of the facts and a detailed analysis of the facts applicable to each issue are necessary.
I
Facts
The Agreements Between Sodexho and the Hospitals.
A. SFMC
Sodexho and SFMC entered into two consecutive agreements covering the years involved in this appeal, one dated February 1, 1994 and the other dated January 1, 1997. Each agreement was entitled “Combined Services Agreement,” had a term of three years, and was terminable by either party on sixty days written notice to the other. A third agreement, dated January 1, 1997 and entitled “Facilities Management Services Contract,” does not relate to the purchases in issue, and, therefore, 1 will disregard it for purposes of this Opinion. The Combined Services Agreements are almost identical in their provisions. Under each, SFMC *30 “employs Sodexho USA [a predecessor to Sodexho] as its exclusive representative and agent to operate during the term of the contract, the following functions: Food and Nutrition Services, Environmental Services.” Sodexho has operational and financial responsibilities as to food and nutrition services and environmental services, including the following:
[P]rovide a management team for Food, Nutritional and Environmental Services to ensure proper supervision of the operation. [Sodexho] [2] shall provide competent and qualified personnel ... [consisting of a Director of Food and Nutrition, Assistant Manager and Chief Clinical Manager].
[P]urchase all material and other supplies as outlined in the proforma [(attached to each of the agreements)] for use in the operation of Client Food and Nutrition Services and Environmental Services. [Sodexho] may purchase equipment needed for the Client after receiving approval from the Client Administration. In purchasing such materials, [Sodexho] shall act as agent on behalf of the Client. As such agent, [Sodexho] may furnish the Client’s exempt purchase number to suppliers in connection with such purchase.[3]
Sodexho’s food and nutrition service responsibilities include the provision of dietary service in all areas of patient care, cafeterias, public areas, and special function areas. It is responsible for determining and maintaining appropriate quantities of inventory of food stocks and paper goods. Food pin-chases must be at the quality levels specified in the agreements. “The food and nutrition service inventory [remains] the property of [Sodexho] for the duration of the contract.”
Sodexho’s environmental service responsibilities include the providing of housekeeping services “in the areas defined by client.” Sodexho guarantees an annual cost to be paid by SFMC, subject to adjustment if the scope of the services expands. SFMC agrees to make available to Sodexho the cleaning inventory available as of the date of commencement of the agreement, which, together with any inventory Sodexho purchases, remains the “property of the ehent for the duration of the contract.”
*31 During the term of each agreement, SFMC is obligated to provide Sodexho with use of kitchens, dining rooms and related equipment, office space, utilities and the services of SFMC’s maintenance staff. Sodexho must return all materials and equipment in good condition at the end of the term subject to normal wear and tear. “The need for outside contractors will be mutually agreed upon by both parties and paid for by the client.”
Sodexho is required to provide liability insurance protecting itself and SFMC, and agrees to indemnify the hospital against liability of any kind or nature “arising out of or in connection with the purchase, preparation and service of food or refreshments, or negligence by Sodexho, its agents, or employees related to professional services rendered by Sodexho management staff.”[4]
For meals and additional nourishments provided to patients under the 1994 Combined Services Agreement, Sodexho receives payment of a guaranteed amount per patient day (that is, the number of patients in the hospital each day) to cover costs of food, supplies, Sodexho’s payroll costs, and its fee. Any adjustment to the guaranteed per patient day amount is to be determined “mutually by [Sodexho] and the hospital.” The 1997 Agreement contains a similar provision applicable through June 30, 1998. Thereafter, the per patient day rate is reduced to cover only food costs, general expenses, and fees, and SFMC pays a separate per diem amount to cover Sodexho’s payroll cost. If the patient cost incurred by Sodexho exceeds the guaranteed maximum set forth in the agreements, SFMC is not responsible for the difference. Under both agreements, Sodexho has the right to invoice the hospital for functions based on a 33% markup over actual cost, and is required to bill the hospital monthly for food transferred to parties designated by the hospital. Sodexho has no obligations with respect to credit sales by the hospital.
Cafeteria prices are determined “by mutual agreement,” subject to annual adjustment so as to maintain a specified cost-price ratio. *32 If annual gross cash sales in the cafeteria exceed a specified dollar amount, SFMC receives a commission on sales in excess of that amount. All receipts collected from the operation of the cafeteria are “deposited into the [Sodexho] account.”
Each month, Sodexho bills SFMC for food and nutrition services in an amount equal to an estimate of the amount to be paid for the month and an adjustment for the difference between actual and estimated amounts for the preceding month. Environmental services are billed at the beginning of each month, with late charges imposed for untimely payments. In the event any sales or use tax is imposed on any purchases by Sodexho, “the consideration herein set forth shall be adjusted to defray or offset this added cost.”
Each agreement provides that Sodexho may allow SFMC to use certain proprietary documents and information which are Sodex-ho’s trade secrets, and SFMC agrees not to disclose or copy any such information. “Proprietary information and Trade Secrets shall include but not be limited to manuals, software, recipes, signage, surveys, computerized data bases, food production systems and menu systems.”
Under the 1994 Agreement, Sodexho is obligated “to purchase furniture for the employee dining room in the amount of $43,958,” and absorb the cost of the furniture during the term of the agreement. If the agreement is terminated before the end of its three year term, SFMC is obligated to reimburse Sodexho for the unamortized balance of the purchase price of the furniture. The furniture becomes SFMC’s property at the end of the agreement term.
Sodexho presented testimony covering the following aspects of the practical functioning of the 1994 and 1997 agreements. Sodex-ho personnel at the hospital reported to the hospital Vice-President of Operations, attended meetings of hospital department heads, meetings of joint commissions and the Infection Control Committee. Sodexho personnel interacted with the SFMC clinical personnel.
*33 Sodexho prepared menus, subject to hospital approval. Sodex-ho selected vendors that offered the best prices, either from its contacts (based on pricing negotiated by Sodexho with the vendor, but not necessarily related specifically to SFMC), or from the vendors with whom the New Jersey Hospital Association had negotiated prices. The hospital retained the right to reject a vendor. Sodexho conducted its own investigation of vendors suggested by SFMC and retained the right to reject a vendor selected by the hospital. Subject to approval by SFMC, Sodexho had the right to bring prospective clients to visit the hospital premises.
The hospital established the hours of cafeteria operation, and had the right to modify the quality of food specified in the agreements. Sodexho was not identified on cafeteria signs or menus, and Sodexho personnel only wore hospital identification badges. Cafeteria receipts deposited in Sodexho’s account were applied to monies due to Sodexho from the hospital. Any excess was transmitted to the hospital.
The procedures for food service purchases were as follows. An inventory clerk employed by SFMC would compare inventory on hand with the levels (par levels) established by Sodexho, and then the clerk would place purchase orders with vendors designated by Sodexho. Deliveries were made to the hospital, accepted by hospital employees, and stored in the hospital facilities. Invoices for food and supplies were reviewed by a hospital secretary and forwarded to a Sodexho off-site office for payment.
Hospital employees operated the food service and environmental service departments, under Sodexho’s management. Sodexho did the “interviewing, hiring and firing” of hospital employees for these departments and exercised its discretion in selecting employees. Approval by the hospital was required as to some employees. Sodexho retained the right to terminate for cause a hospital employee in the food service and environmental service departments. The hospital did not participate in workers compensation or unemployment hearings. Sodexho trained hospital food service and environment service employees with respect to proce *34 dures and policies contained in Sodexho manuals. Hospital employees and Sodexho employees received training from SFMC and from Sodexho in certain hospital procedures, particularly those relating to sanitary conditions, infection control, and core values (kindness, respect for others, service). Hospital procedures and policies controlled in the event of a conflict with Sodexho procedures or policies.
Invoices for food and supplies purchased under Sodexho’s management generally contained both the name of the hospital and Sodexho under the heading “Sold To.” The names were set forth as “St. Francis Medical, Sodexho USA (or Sodexho),” “Sodexho USA (or Sodexho or Sodexho Management Services), St. Francis Medical Center,” or “St. Francis Hospital, Attn: Food Serv. Dir.” or “Attn. Sodexho Env. Svcs.” The Sodexho food service manager was “responsible and accountable for all the food purchasing services,” attended meetings, prepared reports, controlled costs and otherwise performed the duties of a department manager. The Sodexho dietician met with patients and physicians and recommended patient diets. In setting the food service inventory par levels, Sodexho used its proprietary software. The establishment of those levels was done independently of the hospital. In general, Sodexho personnel had the responsibility to supervise, manage, and direct the hospital employees in the operation of the food service and environmental service departments.
The SFMC Vice-President of Operations testified that he exercised “full authority control” over the Sodexho personnel, exactly as he would over hospital employees. That control included cafeteria hours, designation of vendors, menu pricing, and environmental procedures for infection control. In addition, the hospital had the right to reject a proposed Sodexho employee. He further testified that the vendors identified by Sodexho had better prices than those available through the New Jersey Hospital Association and, therefore, most purchases were through Sodexho vendors. Sodexho did not have the authority to enter into contracts on behalf of the hospital.
*35 This witness also testified that, in selecting Sodexho, the hospital sought, among other qualities, contacts with vendors and management expertise. This expertise included the ability to prepare menus and submit them for approval to the hospital, rather than having the hospital decide what was to be included on each menu. Thus, after hiring Sodexho, SFMC no longer had to make specific decisions about menu offerings or about the selection of food brands or vendors.
B. SEH
Sodexho’s relationship with SEH for the years under appeal was pursuant to an agreement dated January 1, 1993, having an initial term of five years, and terminable at any time by either party upon sixty days notice to the other. Under this document, The Seiler Corporation (subsequently merged into Sodexho) is engaged by the hospital “as its exclusive representative and agent to operate during the term of the agreement, the food service facilities maintained ... by the Hospital” for patients, for hospital staff, and visitors. The language of the agreement is somewhat different from the SFMC agreements, but the substantive provisions are essentially the same with the following exceptions. SEH expressly reserves the right to supervise Sodexho’s operation of the food service facilities, its methods of service, safety, sanitation, maintenance. SEH also expressly reserves the right to make regulations with respect to these matters, and Sodexho agrees to comply with the regulations.
As opposed to the arrangement with SFMC, Sodexho does not guarantee a “per patient day” cost, and the agreement does not specify a profit margin for cafeteria or coffee shop operations. The agreement with SEH provides that the pricing structure “will be established by mutual agreement,” and contains the following provision as to financial arrangements:
This agreement is based upon a “management fee” or cost-plus relationship. A management fee relationship consists of three distinct financial arrangements. The first consists of direct pass through of invoiced cost of the goods and labor paid *36 on behalf of the hospital by [Sodexho].[5] The second consists of indirect costs computed and expended by [Sodexho] to facilitate the task of proper administration of the Hospital’s dietary department____The third consists of [Sodexho’s] fee to be earned from its management services to the Hospital.
The agreement states that no purchase of equipment or supplies “for the account of the hospital” may be made without prior approval by the hospital and that “[t]he food, paper and cleaning inventory shall remain the property of [SEH] for the duration of the contract.”
The agreement contains a requirement that Sodexho invest “up to $55,000 for cafeteria renovations and ... an additional $50,000 for coffee shop renovations.” The investment in cafeteria renovations is described as consideration for a five year term for the agreement, and Sodexho receives no reimbursement of the investment if the agreement remains in effect for five years. Sodexho is to be repaid its investment in the coffee shop, without interest, by retaining one-half of coffee shop revenues in excess of a specified amount per month. If coffee shop revenues are insufficient to repay the investment as of the expiration of the five year term, then SEH agrees to pay the unamortized balance.
Testimony by a representative of SEH and by Sodexho personnel established that the relationship between Sodexho and SEH functioned in a manner similar to that between Sodexho and SFMC. The hospital made final decisions based on recommendations by Sodexho, including decisions as to items such as the cafeteria menu, hours of operation, and pricing. A hospital representative interviewed any person whom Sodexho proposed to assign to the hospital. Vendors were selected from those who had negotiated prices with the New Jersey Hospital Association. So-dexho made the selection in consultation with a hospital representative. Sodexho set up vendor accounts and paid the vendors subject to reimbursement by SEH. The hospital did not require any specific method of food service. Sodexho established food preparation procedures, policies, and recipes, and could use and retain its procedure manuals. Sodexho deposited cafeteria re *37 ceipts in its account, deducted its costs and fees, and remitted any balance to the hospital.
Sodexho provided comprehensive training for its managers, each of whom received a Sodexho policy and procedures template customized for SEH. Sodexho used its own accounting software and its software for inventory control.
If Sodexho wished to discharge or transfer any of its personnel, approval by SEH was not required, but the hospital would be advised of any such changes. The salaries for the Sodexho personnel were determined by Sodexho and not by the hospital.
II
Whether Sodexho Was An Agent for SFMC or SEH and, If So, Whether It Qualifies For a Derivative Exemption
The SUT Act imposes a six percent tax on “[t]he receipts from every retail sale of tangible personal property, except as otherwise provided in this act.” N.J.S.A. 54:32B-3(a). Purchases of tangible personal property not subject to sales tax are subject to a six percent use tax “for the use within this State” of the property. N.J.S.A. 54:32B-6. A retail sale includes “[a] sale of tangible personal property to any person for any purpose, other than ... for resale either as such or as converted into or as a component part of a product produced for sale by the purchaser.” N.J.S.A. 54:32B-2(e)(1) Sales of materials and supplies for use in “improving, altering, or repairing real property of others” are retail sales. N.J.S.A. 54:32B-2(e)(2). However, under N.J.S.A. 54:32B-8.22, sales to contractors or repairmen of materials or supplies, for use in “improving, altering or repairing” real property of an entity identified in N.J.S.A. 54:32B-9(a) or (b), are exempt from sales and use tax. The parties have stipulated that SFMC and SEH are both organizations that qualify for exemption under N.J.S.A. 54:32B-9(b).
The SUT Act is intended to be “broadly inclusive,” Adamar of New Jersey v. Director, Div. of Taxation, 17 N.J.Tax 80, 86 (1997), aff'd o.b., 18 N.J.Tax 70 (App.Div.1999). It express *38 ly provides that the receipts from retail sales are presumed to be taxable “until the contrary is established, and the burden of proving that any such receipt ... is not taxable hereunder shall be upon the person required to collect tax or the customer.” N.J.S.A. 54:32B-12(b). Exemptions from taxation are narrowly construed. Metpath, Inc. v. Director, Div. of Taxation, 96 N.J. 147, 152, 474 A.2d 1065, 1067 (1984). “[A]n exemption from taxation is a departure from the equitable principle that everyone should bear his just and equal share of the public tax burden. Taxation is the rule; exemption is the exception to the rule.” Phelps Dodge Indus. v. Director, Div. of Taxation, 8 N.J.Tax 354, 358 (1986).
The parties do not dispute that, if the Hospitals had purchased the paper goods, cleaning supplies, and furniture and materials in issue, those purchases would be exempt from sales and use tax. Sodexho contends that, because it functioned as the agent for each of the Hospitals in making the purchases, the purchases should remain exempt from tax. The Director asserts that derivative exemptions are not permitted by the SUT Act and that, in any event, the relationships between Sodexho and the Hospitals do not warrant the granting of derivative exemptions.
An agency relationship comprises a variety of arrangements, and, as discussed below, I conclude that the nature of the agency relationship is critical to a determination of whether a derivative exemption can be permitted. Accordingly, in order to evaluate Sodexho’s derivative exemption claim, I must determine whether Sodexho had an agency relationship with either SFMC or SEH, and, if so, whether the relationship was such as to warrant extending the SFMC or SEH use tax exemption to Sodexho.
An agency relationship has been defined as follows:
An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent. There need not be an agreement between parties specifying an agency relationship; rather, “the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation.” ... Moreover, direct control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent.
*39 [Sears Mortgage Corp. v. Rose, 134 N.J. 326, 337-38, 634 A.2d 74, 79-80 (1993) (citations omitted).]
A similar definition appears in the Restatement (Second) of Agency:
(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
(2) The one for whom action is to be taken is the principal.
(3) The one who is to act is the agent.
[Restatement (Second) of Agency § 1 (1958).]
The comment to this definition notes that “[i]t is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements.” Id. at comment b.
The agency relationship encompasses a spectrum of arrangements extending generally from principal-independent contractor to master-servant. The term independent contractor “is used as a term to indicate someone employed but who is not a servant of the employer ... [W]hile the term is antithetical to the term servant, all agents except servants fall within its meaning.” Warren A. Seavey, Handbook of the Law of Agency § 10 at 20 (1964). See also W. Edward Sell, Agency 15 (1975) (“An independent contractor may also be an agent and, in fact, all agents who are not servants are independent contractors.”) and Restatement (Second) of Agency, which states:
“[independent contractor” is a term which is antithetical to the word “servant”, although not to the word “agent”. In fact, most of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to then-physical conduct in the performance of the services. However, they fall within the category of agents.
[Restatement (Second) of Agency, supra, § 14N comment a.]
The Restatement defines the distinctions between the master-servant relationship and principal-independent contractor relationship as follows:
(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.
*40 (2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.
(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other’s right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.
[Id. at § 2.]
See also, Seavey, supra, at 5. The Restatement sets forth the following factors “among others” to be used in deciding whether an agent is a servant or an independent contractor:
a. the extent of control which, by the agreement, the master may exercise over the details of the work;
b. whether or not the one employed is engaged in a distinct occupation or business;
c. the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
d. the skill required in the particular occupation;
e. whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
f. the length of time for which the person is employed;
g. the method of payment, whether by the time or by the job;
h. whether or not the work is A part of the regular business of the employer;
i. whether or not the parties believe they are creating the relation of master and servant; and
j. whether the principal is or is not in business.
[Restatement (Second) of Agency, supra, at § 220(2).]
Our Supreme Court adopted the Restatement tests for distinguishing between a servant and an independent contractor in Mavrikidis v. Petullo, 153 N.J. 117, 132, 707 A.2d 977 (1998). In Lowe v. Zarghami, 158 N.J. 606, 731 A.2d 14 (1999), the Court described the master-servant relationship as follows:
The master-servant relationship exists whenever the employer controls both the nature of the work performed and the manner in which the work is completed. On the other hand, an employer hires an independent contractor to complete a particular task, but does not direct the manner in which it is to be completed. [Id. at 615-16, 731 A.2d 14, 19 (citations omitted).]
In applying the foregoing legal standards for an agency relationship to the arrangement between Sodexho and each of the Hospitals, I conclude that each relationship satisfied the require *41 ments for an agency relationship, at the principal-independent contractor end of the agency spectrum. As the above description of the relationships between Sodexho and the Hospitals reveals, each Hospital exerted control over what Sodexho did, and Sodexho had fiduciary obligations to each Hospital. The agreements between Sodexho and each of the Hospitals designated Sodexho as an agent, and each of the Hospitals retained approval rights as to menus, vendors, and cafeteria prices. Each of the Hospitals provided facilities and equipment for use by Sodexho in performing its obligations. Sodexho was obligated to comply with certain policies and procedures of each of the Hospitals. At SFMC, Sodexho was obligated to provide environmental services in areas designated by the hospital. At both Hospitals, Sodexho deposited cafeteria receipts in its account, but was required to remit to SFMC or SEH any amounts in excess of amounts due to Sodexho.
No express authority, statutory or otherwise, authorizes the extension to an entity’s agent of a statutory exemption from sales or use tax available to the entity. Consequently, I must determine under what circumstances, if any, the SUT Act permits a derivative exemption. Both parties have cited out-of-state decisions in support of their respective positions relating to agency. Sodexho relies on Araserve, Inc. v. Commissioner of Revenue, No. 223254, 1998 WL 888985 (Mass.App.Tax.Bd. Dec.2, 1998). There, the Appellate Tax Board ruled that a company operating and managing cafeterias at colleges and preparatory schools, for which it received cost reimbursement plus a management fee, was exempt from use tax because it acted as an agent for the schools in purchasing supplies. The Board found that “[a]ll purchases were subject to the institutions’ approval and title to the supplies remained in the institutions’ name.” Id. at *1.
Araserve is distinguishable on its facts and involves a different statutory standard from that applicable in New Jersey. The Massachusetts statute defined a taxable use as “the exercise of any right or power over tangible personal property incident to the ownership of that property.” Id. at *3. The New Jersey use tax applies to any “use within this State” of tangible personal property not subject to sales tax. N.J.S.A. 54:32B-6. Consequently, Am- *42 serve does not suggest the appropriate result under the facts before me, where Sodexho’s control and discretion in purchasing supplies is significantly greater than Araserve’s, and our use tax statute is broader in scope than the Massachusetts statute. In addition, as discussed below, I reject the analysis by the Appellate Tax Board because it appears to accept any agency relationship as warranting a derivative exemption.
Sodexho also cites a decision by the Maryland Tax Court, Sodexho Marriott Management, Inc. v. Comptroller of the Treasury, Nos. 98-SO-00-0401, 98-SU-00-0400, 2000 WL 33354701 (Md.Tax Jan.11 2000), and a decision by the Tennessee Chancery Court, Sodexho-Marriott Management, Inc. v. Johnson, No. 98-3318, February 4, 2002 each of which allows a derivative sales and use tax exemption to an entity related to Sodexho. Both courts apparently found that the plaintiff acted as an agent for a tax-exempt organization in making purchases. The Maryland decision is not helpful because neither the factual basis nor the legal analysis for the court’s conclusions appears in the reported decision, which consists only of the order entered by the court. The Tennessee decision, a Memorandum and Order modifying a final judgment previously entered, contains only a summary of certain facts and no meaningful legal analysis. Based on the limited facts set forth, the decision is distinguishable because the degree of control exercised by the tax-exempt organizations appears to have far exceeded the control exercised by either of the Hospitals over Sodexho. Furthermore, if the decision permits a derivative exemption in any agency relationship (this cannot be determined from the contents of the Memorandum and Order), I regard the ruling as incorrect based on the analysis set forth below.
The Director cites a California decision rejecting a claim of a derivative exemption from sales tax on gross receipts. Automatic Canteen Co. of Am. v. State Bd. of Equalization, 238 Cal.App.2d 372, 47 Cal.Rptr., 848 (1965). The court held that Automatic Canteen Co., a successor by merger to Nationwide Food Service, Inc., did not act as an agent for companies for which it provided in-plant food service to employees, and, therefore, did not qualify for the exemption from sales and use tax granted by California *43 statutes to sales of food provided by employers to employees. Id. at 858-59. The court cited the following factors derived from the Restatement (Second) of Agency § 220(2) as supporting its decision:
1) in providing food service, the company complied with the employers’ requirements “only as to the results of the services and not as to the means whereby they were accomplished,” Automatic Canteen supra at 387, 47 Cal.Rptr. 848;
2) food services is a distinct category of business and the company was engaged because of its “specialized skill” in operating employee cafeterias, id. at 388, 47 Cal.Rptr. 848; and
3) payments were on a cost plus basis, indicative of an independent contractor arrangement. Ibid.
A New York court refused to grant a derivative exemption on purchases of food and supplies by a company which provided management of food service operations at educational and health care institutions. Custom Mgmt. Corp. v. New York State Tax Comm’n, 148 A.D.2d 919, 539 N.Y.S.2d 550 (1989). Under facts somewhat different from those before me, the court held that the nature of the agency relationship did not warrant extending the institutions’ exemptions to Custom Management.
We conclude from the record that petitioner’s control over the details of its food management service supports the determination that it was not merely an agent for the tax-exempt entities. Indeed, it was specifically hired so that its institutional clients would be relieved of responsibility for running this service. Evidence that petitioner purchases the food and supplies, usually determines which vendors to use, performs the bookkeeping functions and generally places all the employees on its payroll supports respondent’s determination. In sum, petitioner did not meet its burden of showing that it was acting solely on behalf of and subject to the control of its institutional clients.
[Id. at 551.]
See also In re Seiler Corp., Nos. 39881 and 42248, 1986 WL 31491 (N.Y. State Tax Comm’n Sept. 13, 1985) (holding that, in the absence of proof as to “the extent of ... control over Seiler’s activities,” id. at *5, Seiler could not use the exemption from sales and use tax available to hospitals for whose food service departments Seiler provided administrative and financial services, under a cost reimbursement plus management fee arrangement, and purchased inventory using the hospitals’ tax-exempt numbers).
None of the decisions from other jurisdictions is controlling. Mariner’s Landing, Inc. v. Director, Div. of Taxation, 11 *44 N.J.Tax 215, 225 (1989). However, decisions of New York tribunals can provide helpful guidance in interpreting the New Jersey Sales and Use Tax Act because our Act “was obviously drawn from the corresponding New York Sales and Compensating Use Tax Law.” New Jersey Bell Tel. Co. v. Director, Div. of Taxation, 152 N.J.Super. 442, 450, 378 A.2d 38 (App.Div.1977) (Horn, J.A.D., concurring), certif. denied, 75 N.J. 594, 384 A.2d 824 (1978).
The federal courts have confronted an issue analogous to a claim of a derivative sales and use tax exemption in cases involving claims by contractors with the United States Government that, on a derivative basis, they enjoy sovereign immunity from state sales and use taxes. The most recent, and most relevant, federal court decision in this area is United States v. New Mexico, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982). There, the United States contended that three contractors were entitled to the benefit of sovereign immunity and, therefore, were not obligated to pay gross receipts tax, compensating use tax, or sales tax imposed by New Mexico. Under their contractual arrangements with the Government, two contractors received reimbursement of their costs as well as a fixed annual fee and the third received reimbursement of costs and certain intellectual property rights. The contracts provided that title to all tangible personal property purchased by the contractors passed directly from the vendor to the Government, and the Government bore the risk of loss for the property. The contractors placed orders with third-party vendors in their own names and identified themselves as the purchasers. Payments for purchases were made under an advanced funding procedure in which the Government made funds available to be drawn on by the contractors. An amendment to the contracts, made two years after the litigation commenced, provided that each of the contractors functioned as “an agent” of the Government.
The Supreme Court undertook to resolve any confusion resulting from its previous decisions dealing with the issue of the extension of sovereign immunity to government contractors, and articulated the following guiding principles:
1. Immunity does not exist simply because a tax has an effect on the federal government or because the government bears the burden of the tax. For this *45 proposition, the Court relied on its decision in Alabama v. King and Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), where it ruled that an obligation by the United States to reimburse a contractor for taxes imposed on the contractor did not result in a violation of sovereign immunity. United States v. New Mexico, supra, 455 U.S. at 734, 102 S.Ct. at 1382, 71 L.Ed.2d at 591-92.
2. A contractor is not immune from use tax even though the tax is levied on the use of federal property in private hands.
In such a situation the contractor’s use of the property “in connection with commercial activities carried on for profit,” is “a separate and distinct taxable activity.” Indeed, immunity cannot be conferred simply because the tax is paid with Government funds; that was apparently the case in [United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964)], where the contractor made expenditures under an advanced funding arrangement similar to the one involved here.
[United States v. New Mexico, supra, 455 U.S. at 734-35, 102 S.Ct. at 1383, 71 L.Ed.2d at 592 (citations omitted).]
The Court concluded that immunity from taxation applied to a government contractor only as follows:
[T]ax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.
Thus a finding of constitutional tax immunity requires something more than the invocation of traditional agency notions: to resist the State’s taxing power, a private taxpayer must actually “stand in the government’s shoes.” ... [A] state tax is impermissible when the taxed entity is “so intimately connected with the exercise of a power or the performance of a duty” by the government that taxation of it would be “ ‘a direct interference with the functions of government itself.’ ”
[United States v. New Mexico, supra, 455 U.S. at 735-36, 102 S.Ct at 1383, 71 L.Ed.2d at 592-93 (citations omitted).]
With respect to specific immunity from use tax, the Supreme Court relied on its decision in United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713(1964). There, contractors performed maintenance and construction work at Government facilities and were subject to the general direction of the Government. The contractors procured materials and paid for the materials with Government funds under an advanced funding arrangement. Title to the materials passed directly from each vendor to the United States. One of the purchase orders issued by a contractor stated that it was purchasing on behalf of the United States Government. The Supreme Court rejected the argument that the contractors were immune from state use tax.
*46 “The vital thing” is that [the contractors are] “using the property in connection with [them] own commercial activities.” That the federal property involved was being used for the Government’s benefit — something that by definition will be true in virtually every management contract — was irrelevant, for the contractors remained distinct entities pursuing “private ends,” and them actions remained “commercial activities carried on for profit.”
[United States v. New Mexico, supra, 455 U.S. at 739, 102 S.Ct. at 1385, 71 L.Ed.2d at 595 (quoting from United States v. Boyd, supra, 378 U.S. at 44-45, 84 S.Ct at 1521-22, 12 L.Ed.2d at 718) (citations omitted).]
The Supreme Court in United States v. New Mexico also concluded that sales tax was properly imposed and rejected the argument that the purchases by the contractors were in reality purchases by the United States. The Court noted that the contractors made the purchases in their own names, although the Government was directly liable to the vendors for the purchase price. The Court further noted that the vendors were not informed that the Government alone had an independent interest in the purchase, and the contractors did not obtain advance approval from the Government in connection with each purchase.
These factors demonstrate that the contractors have a substantial independent role in making purchases, and that the identity of interests between the Government and the contractors is far from complete. As a result, sales [to contractors] are in neither a real nor a symbolic sense sales to the “United States itself.” It is true that title passes directly from the vendor to the Federal Government, but that factor alone cannot make the transaction a purchase by the United States, so long as the pm-chasing entity, in its role as a purchaser, is sufficiently distinct from the Government.
[United States v. New Mexico, supra, 455 U.S. at 743, 102 S.Ct. at 1387, 71 L.Ed.2d at 598].
Under the analysis in United States v. New Mexico, a government contractor can be immune from state taxation on a derivative basis only if the contractor is sufficiently integrated with the government. As the Supreme Court stated, mere agency is not sufficient. To find sufficient integration, the Court requires an agency relationship equivalent to a master-servant relationship, where, as discussed above, the principal has control over not only what is done by the agent, but also how it is done. In United States v. Muskegon Tp., 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958), a decision the Supreme Court discussed and relied on in United States v. New Mexico, the Court held that a contractor leasing a manufacturing plant from the United States in order to *47 perform Government supply contracts was subject to state taxation. The Court referred expressly to the absence of a master-servant relationship:
The vital thing' under the Michigan statute, and we think permissibly so, is that [the contractor] was using the property in connection with its own commercial activities. The case might well be different if the Government had reserved such control over the activities and financial gain of [the contractor] that it could properly be called a “servant” of the United States in agency terms. But here [the contractor] was not so assimilated by the Government as to become one of its constituent parts.
[United States v. Muskegon, supra, 355 U.S. at 486, 78 S.Ct. at 485, 2 L.Ed.2d at 438.]
Although the foregoing Supreme Court decisions involve issues of derivative sovereign immunity and not derivative tax exemption, the principles enunciated by the Court are directly applicable in the tax exemption context. The practical effect of sovereign immunity is equivalent to tax exemption. As discussed above, tax exemptions are narrowly construed. Consequently, in the absence of express statutory authorization, derivative tax exemptions should be narrowly construed and should be permitted to no greater extent than derivative sovereign immunity is permitted. No decisions by the New Jersey courts set forth the appropriate legal standard for permitting one entity to enjoy the tax exemption of another. I conclude that the standard articulated by the United States Supreme Court in the sovereign immunity context is appropriate and applicable. This standard is consistent with the approach taken by the New York appellate court in Custom Management Corp. v. New York State Tax Commission, supra, 148 A.D.2d 919, 539 N.Y.S.2d 550, and the California appellate court in Automatic Canteen Co. v. State Board of Equalization, supra, 238 Cal.App.2d 372, 47 Cal.Rptr. 848. Therefore, in order for Sodexho to enjoy the tax exemption available to the Hospitals, Sodexho must stand in the Hospitals’ shoes, or, as otherwise stated, must be so closely connected to the Hospitals that it and each of the Hospitals “cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.” United States v. New Mexico, supra, 455 U.S. at 735, 102 S.Ct. at 1383, 71 L.Ed.2d at 592.
*48 The relationships between Sodexho and the Hospitals were not at the master-servant end of the agency spectrum and, therefore, fail to satisfy the foregoing standard. The written agreements between Sodexho and the Hospitals and the testimony at trial demonstrate that Sodexho operated an independent business and pursued its own profit-making purposes and objectives. It retained substantial elements of discretion and control as to how it performed its management services. The following specific examples of that discretion and control are derived from the factual discussion above:
A. the Hospitals retained Sodexho in order to relieve themselves of the managerial responsibility for their respective food service departments, and, in the case of SFMC, the managerial responsibility for its environmental service depart ment, and to benefit from the expertise and industry contacts that Sodexho provided;
B. neither SFMC nor SEH, notwithstanding its rights of approval as expressly set forth in an agreement or as understood by a hospital administrator, elected to become involved in the day-to-day operations of the food service or environmental service departments, and relied on Sodexho to provide management for those services retaining the right to intervene in the event of a problem;
C. in both Hospitals, Sodexho provided its own management expertise, including its own nutritionist, in recommending and developing menus and recipes, recommending patient diets, establishing and implementing the methodology and procedures for food service, and determining inventory levels;
D. Sodexho used and retained its own training manuals, proprietary software, and trade secrets in providing its services to both Hospitals;
E. Sodexho determined the quality, type and brand of the paper goods, cleaning supplies, furniture and materials which it purchased;
F. Sodexho hired and fired hospital employees in the food service departments at both hospitals and the environmental service department at SFMC;
G. Sodexho was obligated to indemnify each Hospital and provide liability insurance;
H. Sodexho had an independent obligation, subject to reimbursement by each of the Hospitals, to make payment to vendors, and, vendors looked to Sodexho and not SFMC or SEH for payment;
I. Sodexho deposited cafeteria monies in its own account to be used to reimburse itself for costs incurred and fees due to it;
J. Sodexho selected the vendors of paper goods and cleaning supplies for SFMC, although the hospital retained rights to object to a particular vendor. At SEH, Sodexho had discretion to select among vendors available through the New Jersey Hospital Association. At both Hospitals, Sodexho made an independent investigation of each vendor; and
*49 K. Sodexho’s purchases from vendors selected by it for SFMC were based on prices negotiated by Sodexho for use on behalf of any of its clients.
That the ultimate burden of any use tax will fall on the Hospitals does not affect my analysis or conclusions. As noted above, the United States Supreme Court held that a contractual agreement, under which the Government reimbursed a contractor for taxes, did not entitle the contractor to derivative sovereign immunity. Alabama v. King and Boozer, supra, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed 3.
I recognize that the paper goods, cleaning supplies, furniture and equipment purchased by Sodexho were used in the Hospitals and that, as acknowledged by the Director, if the Hospitals themselves had purchased the items, the purchases would be exempt from sales and use tax. However, the tax implications of a hypothetical alternative structuring of the arrangements between Sodexho and each of the Hospitals are irrelevant to my determination. “[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not.” General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122, 136-37, 416 A.2d 37, 44 (1980) (quoting Commissioner of Internal Revenue v. National Alfalfa, Dehydrating and Milling Co., 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717, 727 (1974)). This principle was applied in Atlantic City Electric Co. v. Director, Div. of Taxation, 5 N.J.Tax 15 (1982). There, Atlantic City Electric leased electric energy generating equipment from a trust. The trust purchased the equipment for Atlantic City Electric which, under the lease, was liable for any taxes imposed on the equipment or the transaction. The Director imposed business personal property tax (the tax was repealed by L. 1993, c. 174, § 1) on the equipment. The parties stipulated that, if the company had purchased the equipment directly, no tax would be due. Id. at 18. Atlantic City Electric argued that the tax consequences to it should not be different because it leased rather than owned the equipment. The Tax Court, relying on General Trading, rejected the argument. Id. at 22-24.
*50 III
Whether Sodexho’s Purchases Were For Purposes of Resale.
Sodexho asserts that, if its purchases of paper goods, cleaning supplies and furniture and materials are not exempt from use tax on an agency theory, then the purchases are not subject to tax because they were purchases for purposes of resale. As discussed above, the definition of a “retail sale” subject to tax excludes a sale for resale “either as such or as converted into or as a component part of a product produced for sale by the purchaser.” N.J.S.A. 54:32B-2(e)(1). The Director responds by asserting that the payments by the Hospitals to Sodexho, which included reimbursement of the costs of the paper goods, cleaning supplies, and furniture and materials in issue, were payments for services and, therefore, Sodexho did not resell these items to the Hospitals within the meaning of the statute.
Several New Jersey and New York decisions have addressed the issue of whether a resale of tangible personal property occurs in the context of a broader relationship between two parties. In Adamar of New Jersey v. Director, Div. of Taxation, 17 N.J.Tax 80 (1997), aff'd o.b., 18 N.J.Tax 70 (App.Div.1999), the Tax Court held that purchases by hotels of amenities (such as shampoo, conditioner, shoeshine cloths) provided to hotel guests were not resold to the guests but were included in the general hospitality services of the hotel operator. In Boardwalk Regency Corp. v. Director, Div. of Taxation, 18 N.J.Tax 328 (App.Div.1999), the Appellate Division reached a similar conclusion as to non-alcoholic beverages provided free-of-charge to casino patrons. Id. at 350-51. In Adamar of New Jersey, supra, 17 N.J.Tax at 95, this court discussed the significance of the “true object” of a transaction to the determination of whether a sale for resale had occurred, relying on Metpath, Inc. v. Director, Div. of Taxation, 96 N.J. 147, 154, 474 A.2d 1065, 1068 (1984), where our Supreme Court cited with approval Accountants Computer Services Inc. v. Kosydar, 35 Ohio St.2d 120, 298 N.E.2d 519, 527 (1973), for the principle that taxability depends on the real or true object sought by the buyer.
*51 The “true object” analysis is relevant to Sodexho’s sale-for-resale contention. An important aspect of this analysis is whether the transfer of the tangible personal property in question was a critical element of the transaction in which the transfer took place. In Adamar of New Jersey, supra, the court relied on a series of New York decisions as establishing the bases for a “critical element” determination.
In one New York decision, the court held that a Burger King franchisee’s purchases of wrappers for hamburgers and french fries and cups for beverages were for purposes of resale because the wrappers and cups were “a critical element of the final product sold to customers.” Burger King, Inc. v. State Tax Comm’n, 51 N.Y.2d 614, 435 N.Y.S.2d 689, 416 N.E.2d 1024, 1028 (1980). In Celestial Food of Massapequa Corp. v. New York State Tax Commission, 63 N.Y.2d 1020, 484 N.Y.S.2d 509, 473 N.E.2d 737 (1984), and in Dunkin Donuts Mid-Atlantic Distribution Center, Inc. v. Tax Appeals Tribunal, 225 A.D.2d 903, 639 N.Y.S.2d 168 (1996), the New York courts held that napkins, straws, stirrers and plastic utensils provided to customers of a fast food restaurant (Celestial Food) and wax paper used to pick up and separate donuts in boxes (Dunkin Donuts) were not resold. These items were not critical elements of the product sold.
Whez’eas as a cup of coffee cannot be purchased without a container, the same cannot be said of napkins, stirrers and utensils, which are more akin to items of overhead, enhancing the comfort of restaurant patrons consuming the food products ... Although the cost of such items may well be taken into account by the restauranteur when setting the price of food, so are other amenities a restaurant patron expects, such as service, utilities and fixtures, which do not become a part of the product being sold merely because their cost is a factor in determining the price a customer pays.
[Celestial Food, supra, 484 N.Y.S.2d 509, 473 N.E.2d at 738.]
See also Dunkin Donuts, supra, 639 N.Y.S.2d at 169 (holding that wax paper provided “hygienic means of handling the food products” but was not a critical element of the product sold.)
In Helmsley Enterprises, Inc. v. Tax Appeals Tribunal, 187 A.D.2d 64, 592 N.Y.S.2d 851 (1993), the court, relying on the analysis of the New York Tax Appeals Tribunal, held that furniture, furnishings, and consumables in a hotel room were not purchased by the hotel for resale.
*52 [A] hotel such as petitioner’s is not in the business of buying and then reselling the use of guest room furniture, furnishings and guests consumables. Bather, it is in the business of providing a service, the overnight accommodation of its patrons, “and the items at issue were furnished to the hotel’s guests as part of its services.”
[Id. at 853.]
Under the foregoing authorities, in order to determine the merits of Sodexho’s contention that its purchases of paper goods, cleaning supplies, and furniture and materials were for purposes of resale, I must decide whether Sodexho provided these items to the Hospitals as “critical elements” of the product or service being sold by Sodexho to the Hospitals or whether the items were merely incidental to Sodexho’s services. I conclude that the sale for resale exclusion does not apply because the paper goods, cleaning supplies, or furniture and materials were not critical elements of the services Sodexho provided to the Hospitals, and the providing of these items was not the “true object” of the agreement between Sodexho and either SFMC or SEH.
The true object of the agreements between SFMC and Sodexho and the agreement between SEH and Sodexho was the obtaining of Sodexho’s expertise in providing management services for the food service department of each hospital and, in the case of SFMC, its environmental service department. Sodexho’s purchases of paper goods, cleaning supplies, and furniture and materials were incidental to that true object. Sodexho’s receipt of reimbursement of the costs incurred in purchasing the paper goods and cleaning supplies and the cost of the coffee shop renovations at SEH does not affect the essence of its services to either of the Hospitals. If a hotel room bill contained a separate charge for the cost of shampoo, hair conditioner, shoeshine cloths, or the use of room furniture, the charge would not alter the nature of the hospitality service provided by the hotel. See Adamar of New Jersey, supra, 17 N.J.Tax 80. Thus, the mere fact that the Hospitals reimbursed Sodexho for the cost of most of the items in issue (see discussion below as to furniture and materials) is not determinative of the question of whether those items were resold to the Hospitals “as such,” were “a component part of a product produced for sale by the purchaser,” N.J.S.A. 54:32B-2(e)(1)(A), *53 or were simply provided as an incident to Sodexho’s management services.
Sodexho does not, and cannot, argue that the paper goods, cleaning supplies, or furniture and materials in issue were converted into or were a component of a product produced by Sodexho. Sodexho did not produce a product; it provided a management service. Sodexho’s services would be unaffected if it did not purchase any of these items. Consequently, the items are not critical elements of the services provided by Sodexho and were not resold “as such.” That the purchases were incidental to Sodexho’s management services is demonstrated by the procedures Sodexho established for purchases of food and supplies for the food service at both Hospitals. Hospital employees performed inventory checks, and generally did the ordering. Sodexho’s contributions to the process were management functions — the training of the hospital employees, and, using its own software, determining appropriate inventories. Sodexho’s initial payment for the purchases was a convenience to the Hospitals, but not a critical element of Sodexho’s services.
Sodexho’s sale-for-resale argument as to paper goods and furniture it purchased for SFMC is contradicted by the written agreements between the parties which provide that food and nutrition service inventory “shall remain the property of [Sodexho] for the duration of the contract” and that Sodexho would “absorb the cost of the furniture” during the term of its agreement with the hospital. With respect to SEH, the sale-for-resale agreement as to materials purchased for Sodexho’s investment in cafeteria renovations is contradicted by the provision in the agreement that, if it remained in effect for five years, “there will be no repayment of this investment by the Hospital.” No sale to either hospital can occur when the items purchased by Sodexho remain its property.
Sodexho’s purchases of paper goods and cleaning supplies might constitute critical elements of its services if Sodexho were engaged in the sale of food or itself performed cleaning services. See Burger King, supra, 51 N.Y.2d 614, 435 N.Y.S.2d 689, 416 N.E.2d 1024. Under those circumstances, arguably, the paper goods *54 would be resold to patients or cafeteria customers, and the cleaning supplies would be resold to the hospital as part of the cleaning services. However, as discussed previously, Sodexho only provides management services, it does not engage in the sale of food and it does not provide cleaning services to SFMC. This analysis is consistent with a decision by the New York Division of Tax Appeals.
The issue concerning whether recurring purchases by Automatique, Inc. of paper and plastic products which were, in turn, furnished by it to certain exempt organizations, along with bulk foodstuffs, were purchases for resale is not as easily resolved. Unlike the taxpayer in Custom Management Corp. v. [New York State] Tax Commission (supra)[, 148 A.D.2d 919, 539 N.Y.S.2d 550], Automatique was not operating a food service facility. Rather, it was providing bulk foodstuffs along with necessary paper and plastic products. Although [some] contracts____specify that Automatique shall provide "plastic flatware”, the other contracts do not appear to so specify. Further, [other] contracts refer to Automatique as a “catering service”. Consequently, it cannot be concluded that Automatique’s purchases of paper and plastic products were being resold as such to these institutional customers. Rather, it is reasonable to conclude that the provision of paper and plastic products were “purely incidental to the primary purpose of [Automatique’s] business.”
[In re Automatique, Inc., Nos. 806584-806588, 1991 WL 119495 at *15 (N.Y. Div. Tax App. May 23, 1991) (citations omitted).]
IV
Whether Sodexho Purchased Furniture and Materials as a Contractor.
Sodexho’s final contention is that, in purchasing furniture for use in the SFMC employee dining room and in purchasing materials for use in making renovations to the SEH cafeteria and coffee shop, Sodexho was acting as a contractor exempt from sales and use taxation under N.J.S.A. 54:32B-8.22. This statute, in relevant part, provides an exemption for:
[r]eeeipts from sales made to contractors or repairmen of materials, supplies or services for exclusive use in erecting structures or building on, or otherwise improving, altering or repairing real property of: a. organizations described in subsections a and b of section 9 of the “Sales and Use Tax Act,”____
Subsections a and b of Section 9 of the Sales and Use Tax Act are codified as N.J.S.A. 54:32B-9(a) and (b). As noted above, the parties have stipulated that the Hospitals are included in subsection (b) of this statute.
*55 The purpose of the exemption granted by N.J.S.A. 54:32B-8.22 has been described as follows:
The obvious legislative purpose of § 8.22 is to complement § 9 by exempting the payment of sales tax when the tax would have been exempt initially, had the exempt organization itself performed the improvement or repairs, rather than have the work contracted and completed for it by another. Its purpose is to exempt the exempt organization from either directly or indirectly paying the tax.
[Browning Ferris Indus. of South Jersey, Inc. v. State, Dep’t of Treasury, 10 N.J.Tax 96, 101 (1988), aff'd, 236 N.J.Super. 521, 566 A.2d 542 (App.Div.1989)].
The term “contractor,” for purposes of both imposition of sales and use tax and exemption from tax, has been defined by the Director as including any corporation or commercial entity “engaged in any business involving erecting structures for others, or building, or otherwise improving, altering, or repairing real property of others.” N.J.A.C. 18:24-5.2. The Director’s regulations provide that the exemption is available only for “items of tangible personal property purchased by a contractor for incorporation into property as a physical component part of such property.” N.J.A.C. 18:24-5.2. The supplies which may be exempt from tax consist of “items of tangible personal property consumed in the fulfillment of a construction contract, which items do not become a physical component of the property upon which work is performed.” Ibid. These definitions were implicitly approved in Mal Brothers Contracting Co. v. Director, Div. of Taxation, 124 N.J.Super. 55, 60-62, 304 A.2d 750, 752-54 (App.Div.), certif. denied, 63 N.J. 554, 310 A.2d 469 (1973), where the court stated: “Further, it is evident that the Legislature did not intend to exempt all tangible personal property sold to contractors for exclusive use in improving, altering or repairing real property owned by exempt organizations. It chose to exempt only a limited class of such tangible personal property, ‘materials and supplies.’ ” Id. at 61, 304 A.2d at 753.
I reject Sodexho’s contentions under N.J.S.A. 54:32B-8.22 as to furniture purchases for the SFMC employee dining room for the following reasons:
1. Sodexho is not a “contractor” as defined in the regulation quoted above;
2. the furniture that Sodexho was obligated to purchase does not constitute construction materials or supplies as those terms are defined in the regulations;
*56 3. the furniture does not constitute an improvement, alteration or repair to the hospital facility;
4. Sodexho paid for the purchase and received no reimbursement from SFMC.
The 1994 agreement between Sodexho and SFMC reflects that the purpose of Sodexho’s investment was to induce the Hospital not to terminate the agreement before expiration of its term. Thus, Sodexho did not purchase the furniture for purposes of improving, altering or repairing the hospital premises, since that was not the true object of the purchase. The true object of the purchase was to provide furniture, at Sodexho’s expense, so that it could earn its management fees for the full term of the agreement.
The situation is essentially the same as to SEH cafeteria renovations. There, the agreement between the parties required Sodexho’s predecessor to invest $55,000 for these renovations. The investment was “in consideration of a five year term of agreement,” and Sodexho received no repayment of its expenditure if SEH did not terminate the agreement before expiration of the five year term.
Sodexho’s claim of a contractor’s exemption under N.J.S.A. 54:32B-8.22 as to its purchases of materials for cafeteria renovations at SEH fails not only for the foregoing reasons, but also because Sodexho provided no evidence that it satisfied the definition of “contractor” in N.J.A.C. 18:24-5.2 and provided no evidence as to what renovations, if any, it made to the cafeteria. A similar lack of proof defeats Sodexho’s claim as to the SEH coffee shop (where SEH repaid Sodexho’s investment). Neither the contract between Sodexho and SEH, the invoices attached to the Stipulation of Facts, nor the testimony of the witnesses presented by Sodexho provided any information as to what materials or supplies, if any, were purchased for these renovations or as to what renovations, if any, were made. It is Sodexho’s burden to prove that it qualifies for the statutory exemption. Sodexho failed to satisfy its burden.
V
Summary and Conclusion.
The following summarizes my conclusions:
*57 1. Sodexho acted as agent for SFMC and SEH in making the purchases of paper goods, cleaning supplies, and furniture and materials in issue. However, it does not qualify for a derivative exemption from use tax because its relationship with each hospital lacked the characteristics of the master-servant type relationship required for a derivative exemption.
2. The purchases are not excluded from tax as purchases for resale because the true object of the relationship between Sodexho and each of the Hospitals was the provision by Sodexho of management expertise and services. Sodexho provided the paper goods, cleaning supplies, and furniture and materials as an incident to its services and did not resell the items “as such or converted into or as a component part of a product produced for sale” by Sodexho. N.J.S.A. 54:32B — 2(e)(1). In addition, Sodexho retained title to paper goods and furniture purchased by it for use at SFMC, and, therefore, no resale could have occurred.
3. Sodexho did not act as a “contractor” under N.J.S.A. 54:32B-8.22 with respect to furniture purchases for the SFMC employee dining room or materials purchased for renovations to the SEH cafeteria and coffee shop. In addition, Sodexho provided no proofs as to what renovations, if any, it made or what materials or supplies, if any, it purchased.
Judgment will be entered in favor of the Director affirming his assessments of use taxes.

 Sodexho’s appeal challenged use tax assessments on its purchases for several institutions in addition to the Hospitals. The parties selected the assessments with respect to the Hospitals as test cases to resolve the legal issues common to all of the assessments under appeal.

 The agreements name Sodexho USA.

 The quoted language appears in the 1997 agreement. The 1994 agreement contains provisions which are identical in substance but worded slightly differently.

 This quotation is from the 1997 agreement. The 1994 agreement contains a provision which is identical in substance but worded slightly differently.

 The agreement names Seiler.